VICTOR C. HOWARD, JUDGE
Angela Henderson appeals her convictions for second-degree felony murder, section 565.02, armed criminal action, section 571.015, and tampering with physical evidence, section 575.100, and sentences as a prior and persistent offender to consecutive terms of life, twenty-five years, and 3 years imprisonment, respectively.[1] Henderson contends that the trial court plainly erred in submitting the verdict directors for felony murder and tampering with physical evidence and that it abused its discretion in excluding evidence regarding a letter written to the prosecutor by Henderson's cellmate. The convictions are reversed, and the case is remanded for a new trial.
Factual Background
Clinton Justice, known as "Sam," (Victim) was a Navy veteran and lived in an apartment in St. Joseph on his monthly veteran's benefits. Henderson dated Victim *596 for seventeen years. Their relationship was "on-again off-again." Josh Mollett is Henderson's mentally challenged son. He was in his early 20s at the time of Victim's murder. Victim was like a "stepdad" to Mollett; he looked after Mollett. They loved each other and spent a lot of time together.
Approximately three months before the murder, Henderson began a relationship with Kim Keith. Keith pleaded guilty to second-degree murder for Victim's murder and was serving a fifteen-year sentence. As a condition of his plea agreement, he was required to testify truthfully against Henderson. Keith was a drug dealer, who sold methamphetamines and other drugs. He was also addicted to methamphetamines. He testified that late on the night of Friday, December 7, 2012, or in the early morning hours of Saturday, December 8, he received a call from Henderson that she wanted to meet him to buy an eight ball of meth, which sold for $300. When he arrived at the meeting, Henderson was with her son, Mollett, who Keith had known for about ten years "since he was a little kid." Henderson and Mollett did not have the money to buy the drugs so Keith accompanied them in their car to an apartment building to get the money.
When they arrived, Henderson got out of the car, and Keith gave her "the dope" to show "whoever [she] was getting the money from." Keith did not know at that time from whom Henderson was going to try to get the money. Keith and Mollett waited in the car, and each did a shot of meth. After waiting "a good ten minutes" for Henderson to return, Keith and Mollett went into the apartment because Keith "wanted my money or my dope, one of the two." Keith testified that he was "really high" at the time and that the three of them went into Victim's apartment "to do a drug deal."
When they entered the apartment, Keith saw Victim, who he realized he knew because his cousin was married to Victim's daughter. Victim was sitting in a recliner, and Henderson was sitting on a loveseat. Henderson still did not have the money and told Victim that she needed it. Victim said, "I'm not buying you your f* * *ing dope." Mollett then told Victim, "[W]e got to have the money." According to Keith, Henderson then "looked at [Mollett] and went like that (demonstrating), and [Mollett] got up, walked behind [Victim], pulled his head back, and when [Mollett] did that, [Henderson] went and cut him from side to side on the throat." Keith got the drugs back and left on foot.
As he was walking down the street, Henderson and Mollett pulled up in their car and asked him if he wanted to trade some Percocet and Xanax for meth. When he said no, Mollett held up a $50 bill and asked if he could get a half of gram of meth. Keith sold him the drugs and continued walking.
Victim had contact with his two daughters throughout the week before his murder. On Monday and Tuesday, December 3 and 4, 2012, one of Victim's daughters took him Christmas shopping for his family. Later in the evening of the fourth, Victim celebrated his fifty-seventh birthday with his family. On Thursday, he talked to one daughter on the phone around 8pm. Another daughter went to Victim's apartment around 9:30 or 10pm that night to loan him $20 because he was short on cash after Christmas shopping. Neither daughter had contact with Victim on Friday, December 7, although one of them tried to call him several times that day. After still not hearing from their father on Saturday, December 8, one of his daughters and her husband went to his apartment that evening to check on him. They found Victim laying face down in a pool of blood in front of the *597 recliner in the living room. After not finding a pulse, the daughter's husband called 911.
When police arrived, they found Victim had wounds to his neck and right thumb. He had one sock on and one off. A bloody sock was stuck to the wounds on his neck, a fact closely-guarded by police. Victim had blood on the bottom of his bare foot and on the bottom of the sock on the other foot. There were blood and bloody footprints on the carpet from the recliner to the front door and smears of blood on the front door. A green folding chair was lying on top of Victim's body. Cast-off blood splatter patterns were found showing the injuries occurred in front of the recliner; and the right armrest was saturated in blood.
Victim had been stabbed in the upper chest through the right clavicle collarbone, striking a rib and cutting his carotid artery. There was also "a longer slicing type entry" into the neck that produced "a gaping wound" and sliced the jugular vein and created a small hole in the trachea. Victim died from massive blood loss, "his circulating volume," "on the order of a couple of quarts." In addition to the neck wounds, Victim had a defensive wound to his right thumb.
According to his daughters, Victim was very meticulous about his apartment and kept it very clean at all times. It was very neat and tidy, and nothing was ever out of place. Although he no longer smoked, he allowed others to smoke in his apartment but would always empty and wash ashtrays immediately after they were done. Police found cigarette butts in an ashtray in the living room. Henderson's DNA was found on the butt; only one in 1.347 quadrillion individuals in the Caucasian population and one in 55.8 quadrillion individuals in the black population fit the profile. Mollett's DNA was found on two other cigarette butts. Mollett's DNA was also found on a cup in the apartment.
Henderson spoke with police two times shortly after Victim's body was found, giving them inconsistent stories about when she last saw Victim. She initially told them that she had been with Victim Wednesday through Friday morning, leaving around 11am. She then told them she was at the Victim's apartment Tuesday night, leaving Wednesday morning, and not near the weekend. After police pointed out the discrepancies in her stories, Henderson returned to the original version that she left Victim's apartment Friday morning.
Becky Osborn was a friend of Victim's family; she "was basically adopted" by Victim's family when she "was a little kid." She considered Victim as "like my dad" and Mollett was "like my little brother." Victim was there for her when she was growing up when her parents weren't. She had known Henderson for sixteen to eighteen years. On March 28, 2013, almost four months after the murder, Osborn saw Mollett and Henderson in her old neighborhood. When Henderson went into a building, Osborn waived Mollett down to where she was and had a conversation with him about what he had witnessed on the day of the murder. Mollett was distraught and crying. He told Osborn that he was sitting in the living room, smoking with Victim, when "they stabbed [Victim], they threw the knife here, we ran out the back door." Mollett said, "I'm scared, Becky, I don't want to die. I don't know what to do." Osborn urged Mollett to tell the police "this was a murder" because "[Victim] was your dad, dude." When Henderson came back outside and called Mollett over, he told Osborn that he loved her and that was the last time she saw him. She then contacted the investigating detective and told him what she had just heard.
*598 On April 2, 2013, police arrested Henderson and Mollett and interviewed them separately. Mollett told detectives that he and Henderson were at Victim's apartment one afternoon playing Guitar Hero on PlayStation when Keith called Henderson and showed up shortly thereafter. Mollett was sitting in a folding chair, and Henderson was on a couch. About twenty to thirty minutes later, Keith and Victim began arguing because Victim said he didn't have the money that he owed Keith for drugs. Mollett said that he saw Keith stab Victim in the neck. He said that after being stabbed in the neck, Victim attempted to use a sock to save himself but that it was too late. They all watched Victim die. He and Henderson tried to get Keith to leave but Keith started going through Victim's drawers in the apartment looking for money or drugs. Henderson finally threatened to call the police, and they all left the apartment. Mollett said that Keith gave him the murder weapon, Victim's Scorpion knife, and said "good luck." Keith threatened that he would hang Mollett from a tree and that he would shoot Henderson if they told anyone what had happened. Mollett and Henderson left walking in one direction and Keith in another. After walking approximately twenty minutes, Henderson told Mollett it would be a good idea to dispose of the knife, so he threw it in some bushes. Mollett said that Henderson and Keith were together until February and that she was scared and left Keith because of what he did to Victim. The knife was later located by two men in their side yard and retrieved by police. Victim's DNA was found in the fluid on the blade of the knife; only one in 1.471 quadrillion Caucasians fit the profile. Neither Henderson's nor Mollett's DNA was found on the knife.
In her interview that day, Henderson told detectives that she didn't know Keith at the time of the murder but started dating him in January 2013. She said that after she broke up with Keith in February, her son Mollett told her that Keith had admitted to killing Victim. She also said that she did not call the police when she learned of Keith's admission.
Detectives interviewed Keith the next day, April 3. He told them that he had just started dating Henderson two weeks before, he did not know anything about Victim's murder, and it had been a few years since he'd last seen Victim. On cross-examination, Keith testified that he first told detectives the version of events about which he testified at trial on the day after he entered his guilty plea for Victim's murder pursuant to a plea agreement.
In July 2013, a psychologist and certified forensic examiner evaluated Mollett. The psychologist diagnosed him with mild mental retardation with deficits in reasoning, problem solving, abstraction, and judgment. A general adult psychiatrist at Family Guidance Center testified that Mollett had been a patient there for various mental illnesses between 2001 and 2012. During his time at the center, Mollett had been diagnosed with bipolar mood disorder Type 1, ADHD, and either borderline intellectual functioning (IQ between 71 and 84) or mild mental retardation (IQ 55 to 70).
While in the Buchanan County jail on May 1, 2013, Henderson was recorded saying, "I talked to my lawyer today, and she says she was going to talk to his attorney because we're wanting to file and get him incompetent to stand trial and that way he cannot be a witness against me and his statement cannot be used in court." During an October 23, 2013 phone call, Henderson was recorded saying, "They have charged [Mollett] with robbery. Why did they charge him with robbery?" A female on the other end of the line said, "They say he took [Victim's] pills." Henderson responded, "No. I know who *599 took-who got [Victim's] pills." The unknown female said, "You need to shut the f* * * up." During a May 12, 2014 call, Henderson was recorded saying, "They have no evidence and they can't make [Mollett] competent, so their case is f* * *ed." Finally, Henderson was recorded on September 26, 2015, saying, "You got the paperwork that I sent you in the yellow envelope?" A female on the other end said, "What paperwork is that?" Henderson replied in a really low voice, "Testimony. Yours." The female responded, "Well, yeah, I got everything you sent me."
Kelli Hoard was Henderson's cellmate for six months in the county jail. In August 2015, she asked to speak to police regarding statements Henderson made to her about Victim's murder. She testified that although Henderson denied several times that she was at the scene of or involved in the murder, at some point she admitted that "they'd been there, been in an argument of some sort." Henderson told her that Keith had slit Victim's throat while he was sitting in a chair in an argument over oxycodone and Xanax. Henderson also told her that after he was stabbed, Victim went over to the door and locked them out. Henderson said they threw the knife over by a sewage drain and then went to a casino. She said they did not take $500 worth of Christmas presents from the scene because they thought the police would think they did it.
Hoard pleaded guilty to second-degree felony murder in an unrelated case and was sentenced to twenty years imprisonment. Thereafter, she wrote a letter to the prosecutor in December 2015 attempting to recant her August statement to the police about Henderson. She said that she misunderstood what Henderson told her, that Henderson was only telling her what the police thought she had done, not what she actually had done.
Finally, Randy Peterson was Keith's cellmate in 2013 in the county jail. Keith told Peterson that he killed Victim and that Henderson only walked in on it.
The jury found Henderson guilty of second-degree felony murder, armed criminal action, and tampering with physical evidence. The trial court sentenced her as a prior and persistent offender to consecutive terms of life, twenty-five years, and 3 years imprisonment, respectively. This appeal by Henderson followed.
Henderson raises three points on appeal. In points one and two, she challenges the trial court's submission of Instruction No. 8, the verdict director for second-degree felony murder, and Instruction No. 12, the verdict director for tampering with physical evidence arguing that they omitted several elements and definitions of the charged crimes. In point three, Henderson asserts that the trial court abused its discretion in excluding certain evidence and testimony from Henderson's cellmate, Hoard, regarding another letter she had written to prosecutors offering to do whatever the prosecutor needed to help herself in her own case. Points one and two are dispositive and require reversal and remand for a new trial as discussed below. Because point three requests the same relief, and it is uncertain whether the evidentiary issue will arise on retrial, it will not be addressed.
Instructional Error
In points one and two, Henderson asserts that the trial court erred or plainly erred in submitting Instruction No. 8, the verdict director for second-degree felony murder, and Instruction No. 12, the verdict director for tampering with physical evidence, because the instructions omitted several elements of the charged crimes.
Rule 28.03 requires a defendant to make specific objections to jury instructions *600 before the jury retires to consider the verdict, stating distinctly the matter objected to and the grounds of the objection. It further requires the defendant to raise the objection in the motion for new trial. Id. When a defendant fails to object to an instruction as required by Rule 28.03, her claim of instructional error is not preserved for appellate review. State v. Myles , 479 S.W.3d 649, 655 (Mo. App. E.D. 2015). Such claim may, therefore, only be reviewed, if at all, for plain error. Id.
Rule 30.20 provides, in part, "Whether briefed or not, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Plain error review for instructional errors requires a two-step process. State v. Hunt , 451 S.W.3d 251, 260 (Mo. banc 2014) ; Myles , 479 S.W.3d at 655. The first step involves determining whether the claimed error is, in fact, plain error affecting substantial rights. Hunt , 451 S.W.3d at 260. "Substantial rights are involved if, facially, there are significant grounds for believing that the error is of the type from which manifest injustice or miscarriage of justice could result if left uncorrected." Id. Error is plain if it is "evident, obvious, and clear." Id. (internal quotes and citation omitted). If plain error affecting substantial rights is found, the reviewing court determines whether the error actually did result in manifest injustice or a miscarriage of justice. Id. Instructional error rises to the level of plain error if the trial court "so misdirected or failed to instruct the jury that manifest injustice or miscarriage of justice has resulted." Id.
Rule 28.02(c) mandates the exclusive use of an MAI-CR instruction whenever there is one applicable under the law and Notes on Use. State v. Clay , 533 S.W.3d 710, 715-16 (Mo. banc 2017). "If an MAI-CR instruction is modified or a non-MAI instruction used, then the modification or non-MAI instruction 'shall be simple, brief, impartial, and free from argument' and, 'where possible, shall follow the format of MAI-CR instructions, including the skeleton forms therein.' " Id. at 716 (quoting Rule 28.02(d) ). The failure to give an instruction in accordance with MAI-CR or any applicable Notes On Use is error, the prejudicial effect of which must be judicially determined. Rule 28.02(f); State v. Cooper , 215 S.W.3d 123, 125 (Mo. banc 2007).
"A verdict-directing instruction must contain each element of the offense charged and must require the jury to find every fact necessary to constitute essential elements of the offense charged." State v. Stover , 388 S.W.3d 138, 153-54 (Mo. banc 2012) (internal quotes and citation omitted). The due process rights of the defendant are violated when an instruction relieves the State of its burden to prove the existence of every essential element of the crime and does not require the jury to deliberate on and determine a contested element of the crime. Id. at 154. Plain error exists when a verdict directing instruction omits an essential element and the evidence establishing the omitted element was seriously disputed. Id. ; Cooper , 215 S.W.3d at 126.
Felony Murder Verdict Director
Henderson first claims that the trial court plainly erred in submitting Instruction No. 8, the verdict director for second-degree felony murder, for several reasons. She contends that it failed to submit the underlying felony of attempted possession of a controlled substance in a separate instruction with a cross reference to it in the felony murder instruction, it improperly instructed on the underlying felony of attempted possession of a controlled substance in several ways, and it failed to *601 include a paragraph submitting accomplice liability.
At trial, Henderson offered Instruction No. A, her verdict director for felony murder. It provided:
Instruction No. A
As to Count I, if you do not find the defendant guilty of murder in the second degree under Instruction No. ___, you must consider whether he is guilty of murder in the second degree under this instruction.
A person is responsible for his own conduct and he is also responsible for the conduct of other persons in committing an offense if he acts with the other persons with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages the other persons in committing it.
As to Count I, if you find and believe from the evidence beyond a reasonable doubt:
First, that defendant committed the offense of attempted possession of a controlled substance, as submitted in Instruction No. ___, and
Second, that Clinton Andrew Justice was killed by being stabbed, and
Third, that Clinton Andrew Justice was killed as a result of the perpetration of that attempted possession of a controlled substance, and
Fourth, that with the purpose of promoting and furthering the commission of that attempted possession of a controlled substance, the defendant acted together with or aided Joshua Mollett or Kim Keith in committing the offense, then you will find the defendant guilty under Count I of murder in the second degree.
However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree.
The record on appeal does not include the separate proposed instruction on attempted possession of a controlled substance referenced in Instruction No. A. The trial court refused Instruction No. A and submitted Instruction No. 8 offered by the State. Instruction No. 8 provided:
Instruction No. 8
As to Count I, if you find and believe from the evidence beyond a reasonable doubt:
First, that between December 6, 2012, and December 8, 2012, in the County of Buchanan, State of Missouri, the defendant or Joshua Mollett or Kim Keith attempted to possess methamphetamine, a controlled substance, and
Second, that the defendant or Joshua Mollett or Kim Keith was aware of its presence and nature, then you will find the defendant has committed the felony of attempted possession of a controlled substance under this instruction.
Third, that the defendant or Joshua Mollett or Kim Keith caused the death of Clinton Andrew Justice by stabbing him, and
Fourth, that Clinton Andrew Justice was killed as a result of the perpetration of that attempted possession of a controlled substance, then you will find the defendant guilty under Count I of murder in the second degree.
However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree.
At the instruction conference, defense counsel objected to Instruction No. 8 arguing:
Pretty much, Judge, it's the same arguments with regards to what I've marked *602 as A, B, and C. I don't believe it follows the proper-it's not in proper MAI format. It's almost as though it lowers the burden of proof. And the MAI only allows for the language on or about. So that's basically the same arguments with each of those.
In the motion for new trial, the defense asserted, in part, "The trial court erred to the prejudice of the Defendant when the Court overruled Defendant's proposed jury instructions marked A, B, and C and instead used the State's proposed Jury Instructions and allowed the language "between" in reference to the date of the alleged crime instead of the MAI approved language of 'on' or 'on or about.' " While Henderson's objections at trial and in her motion for new trial vaguely touch on the failure to follow the MAI, they do not specifically raise the claims asserted now on appeal. She, therefore, failed to preserve those claims and requests plain error review.
"A person commits the crime of murder in the second degree [felony murder] if he [or she] ... commits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony ... another person is killed as a result of the perpetration or attempted perpetration of such felony...." § 565.021.1(2). "[T]he practical effect of the felony murder rule ... is that [it] permits the felonious intent necessary to a murder conviction to be shown by the perpetration of or attempt to perpetrate a felony." State v. Rumble , 680 S.W.2d 939, 942 (Mo. banc 1984) (internal quotes and citation omitted).
MAI-CR 3d 314.06 is the approved jury instruction for a charge of second-degree felony murder. Paragraph First of that instruction provides:
First, that defendant committed [Insert name of underlying felony, such as "robbery in the second degree" or "attempted robbery in the first degree." ], as submitted in Instruction No. ___, and
When the jury is not otherwise instructed to decide the defendant's guilt of the underlying felony, as is the case here, the party submitting a second degree felony murder instruction must submit a separate instruction for the underlying felony. Notes on Use 2(b), MAI-CR 3d 314.06; State v. Blurton , 484 S.W.3d 758, 767 (Mo. banc 2016). The separate instruction for the underlying felony must be identical to a verdict director for the underlying felony except that it will be modified to state that the jury must find that the defendant "committed" the felony rather than is "guilty" of the felony. Notes on Use 2(b), MAI-CR 3d 314.06; Blurton , 484 S.W.3d at 767-68. "The first paragraph of the second degree felony murder instruction must then cross-reference the instruction for the underlying felony." Blurton , 484 S.W.3d at 768.
The felony underlying the second-degree murder charge in this case was attempted possession of a controlled substance. Henderson was not charged with that underlying felony, and the jury was not instructed to decide her guilt of it. MAI-CR 3d 314.06 and its Notes on Use, therefore, mandated a separate instruction for attempted possession of a controlled substance requiring the jury to find that Henderson committed the felony with a cross reference to that separate instruction in Paragraph First of the felony murder instruction. A separate instruction on the underlying felony was not given in this case in violation of the MAI and its Notes on Use.
Instead, Instruction No. 8 attempted to submit the underlying felony in Paragraphs First and Second. It, however, failed to follow the applicable approved instruction for an attempt crime, in this *603 case MAI-CR 3d 304.06. Paragraphs First through Third of that instruction provides:
First, that (on) (on or about) [date ], in the (City) (County) of ______, State of Missouri, the defendant [Describe the conduct that would constitute the attempt. Do not use the word "attempt." See Notes on Use 2 and 3. ], and
Second, that such conduct was a substantial step toward the commission of the offense of [name of offense with sufficient details to identify person or property involved, e.g., "rape of S.D." or "burglary of a specific building." ], and
Third, that defendant engaged in such conduct for the purpose of committing such [name of offense ],
Contrary to the MAI, Instruction No. 8 contained no description of the conduct that would constitute the attempt and, instead, used the word "attempt." Furthermore, it did not require the jury to find that the described conduct, which was missing, constituted a substantial step toward the commission of the object crime, possession of a controlled substance, or that Henderson engaged in such conduct for the purpose of committing possession of a controlled substance.
MAI-CR 3d 304.06 also requires that if the attempt crime is submitted but the object crime is not, such as the case here, a paragraph defining the object crime must be given, whether the definition is requested or not. Notes on Use 5, MAI-CR 3d 304.06. Mandatory definitions that appear in the verdict directing form or Notes on Use for the object crime must be inserted in the definition of the object crime in subsequent paragraphs. Id. MAI-CR 3d 325.02 is the approved instruction for the object crime in this case, possession of a controlled substance. It provides, in pertinent part:
First, that (on) (on or about) [date ], in the (City) (County) of ____, State of Missouri, the defendant possessed ( [name of controlled substance ] ) (more than 35 grams of marijuana), a controlled substance, and
Second, that defendant (knew) (or) (was aware) of its presence and nature,
* * *
As used in this instruction, the term "possessed" means either actual or constructive possession of the substance. A person has actual possession if he has the substance on his person or within easy reach and convenient control. A person who is not in actual possession has constructive possession if he has the power and intention at a given time to exercise dominion or control over the substance either directly or through another person or persons. (Possession may also be sole or joint. If one person alone has possession of a substance, possession is sole. If two or more persons share possession of a substance, possession is joint.)
Notes on Use 2 of MAI-CR 3d 325.02 requires the term "possessed" to be defined. Instruction No. 8 only partly set out the definition of the object crime, possession of a controlled substance. And it did not contain the required definition of possessed. See State v. Farris , 125 S.W.3d 382, 390 (Mo. App. W.D. 2004) (plain error where "possession" was not defined in verdict director for attempt to manufacture a controlled substance and possession was an essential element of the offense).
After defining the object crime, the approved instruction for an attempt crime next requires the term "substantial step" to be defined. MAI-CR 3d 304.06 requires the following paragraph:
As used in this instruction, the term "substantial step" means conduct that is strongly corroborative of the firmness of the defendant's purpose to complete the commission of the offense of [name of offense ]. (It is no defense that it was *604 factually or legally impossible to commit [name of offense ] if such offense could have been committed had the circumstances been as the defendant believed them to be.)
See also Notes on Use 7(c), MAI-CR 3d 304.06. Instruction No. 8 did not include the required definition of substantial step.
Finally and significantly, Instruction No. 8 fails to properly submit accessorial liability. The approved instruction for second-degree felony murder provides that where the defendant's liability for the underlying felony depends upon accessory liability, the instruction dealing with the commission of the underlying felony must be modified using MAI-Cr 3d 304.04. Notes on Use 6(a), MAI-CR 3d 314.06. MAI-CR 3d 304.04 "provides for the modification of the ordinary verdict directing instruction for an offense to cover the situation where the liability of the defendant is dependant upon his being responsible for the conduct of another person by virtue of being an 'aider and abettor.' " Notes on Use 2, MAI-CR 3d 304.04. It "applies when the evidence shows that the defendant acted with or aided another person or persons in the commission of an offense." Notes on Use 4, MAI-CR 3d 304.04. It "can be used with murder in the second degree-felony but only as to the submission of the underlying felony." Notes on Use 7(a), MAI-CR 3d 304.04.
MAI-CR 3d 304.04 provides, in pertinent part:
A person is responsible for his own conduct and his is also responsible for the conduct of (another person) (other persons) in committing an offense if he acts with the other person(s) with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages the other person(s) in committing it.
(As to Count __, if) (If) you find and believe from the evidence beyond a reasonable doubt:
First, that (on) (on or about) [date], in the (City) (County) of ____, State of Missouri, [Continue using the paragraphs from the MAI-CR 3d verdict director applicable to the offense and set out all the elements of the offense, ascribing the elements to the defendant or other person or persons with whom the defendant acted.... Place a comma at the end of the last paragraph submitting the elements of the offense. Then add the following: ]
Then you are instructed that the offense of [name of offense ] has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:
(Second) (Third) ( [next numbered paragraph ] ), that with the purpose of promoting or furthering the commission of that [name of offense ], the defendant [Insert basis for defendant's conduct being sufficient for being criminally responsible, using one of the following "(acted together with) (aided or encouraged) (acted together with or aided)." See Notes on Use 5 for the various options and when they should be used. After the appropriate option(s), state the name(s) of other person(s) or, if unknown, a general identification of the other(s) involved, such as "another person," "other person(s)," etc. ] in committing the offense, (and)
The second part of the MAI after the introductory paragraph follows the ordinary verdict director for the offense in setting out the essential elements of the offense but is modified to attribute the elements to another person or persons and the defendant as supported by the evidence. Notes on Use 5, MAI-CR 3d 304.04. Then the paragraph following "then you are instructed that the offense ... has *605 occurred" will submit the basis whereby the defendant is responsible for the conduct of another person. Id.
The Notes on Use indicate four usual situations where the liability of the defendant is based in part upon imputing the conduct of another to her: (1) the conduct elements were committed entirely by another person or persons; (2) the defendant and another person or persons were joint actors in the commission of the offense; (3) it is not clear whether the conduct elements were committed by the defendant or another person or persons; and (4) the defendant is personally responsible for all of the elements of the offense and another person was involved. Id. ; State v. Thompson , 112 S.W.3d 57, 68 (Mo. App. W.D. 2003). In the third scenario where the evidence is not clear or conflicts as to which person in a group including the defendant engaged in the conduct constituting the offense, the conduct elements of the offense should be ascribed to the defendant or the other person or persons and one of the alternatives such as "acted together with or aided" is selected in the paragraph following "then you are instructed that the offense of [name of offense ] has occurred...." Notes on Use 5(c), MAI-CR 3d 304.04; Thompson , 112 S.W.3d at 68-69.
In this case, the introductory paragraph beginning "A person is responsible ..." was given separately in Instruction No. 7 in accordance with Notes on Use 3, MAI-CR 3d 304.04, which allows for a separate instruction when all counts and verdict directing instructions submitted are based on accessorial liability. As discussed above, Instruction No. 8 then submitted the felony murder and the underlying felony together. It submitted Paragraphs First and Second regarding the underlying felony in the disjunctive requiring the jury to determine if Henderson or another person, Keith or Mollett, committed the conduct elements in the underlying felony. It also submitted Paragraph Third, the paragraph describing how Victim was killed, in the disjunctive allowing a finding that either Henderson or one of her accomplices in the underlying felony killed Victim. See Notes on Use 3(b), MAI-CR 3d 314.06. Instruction No. 8, however, did not include a paragraph requiring the jury to find that Henderson acted together with or aided or encouraged or acted together with or aided Keith or Mollett in committing the underlying felony. Without such paragraph, the jury was not required to find the basis whereby Henderson was responsible for the conduct of another person in the underlying felony. Cf. State v. Myles , 479 S.W.3d 649, 657-59 (Mo. App. E.D. 2015) ; State v. Jones , 296 S.W.3d 506, 513 (Mo. App. E.D. 2009) (no plain error in cases where verdict directors omitted paragraph that defendant "acted together with" or "aided or encouraged" his accomplices but instead "acted with" language was included in portion of instruction that described the criminal conduct because error did not affect verdict where "acted with" language actually set a higher burden for conviction than the correct instructions would have set.)
Instruction No. 8 provided very little guidance as to what was required to find that Henderson committed the underlying felony of attempted possession of a controlled substance or participated with Keith or Mollett in committing the offense. Contrary to MAI-CR 3d and Notes on Use, the verdict director omitted several elements of the attempt crime, the mandatory definitions of "possessed" in the object crime and "substantial step" in the attempt crime, and the basis for Henderson's criminal responsibility under accessorial liability. Submission of Instruction No. 8, therefore, constituted error.
*606 Furthermore, all of the elements omitted from Instruction No. 8 were in serious dispute. The State presented a version of events through the testimony of Keith that he, Henderson, and Mollett went to Victim's apartment late one night to complete a drug deal because Henderson and Mollett did not have the money they needed to buy the methamphetamines. He testified that when Victim refused to give Henderson and Mollett money for the drugs, they killed him. Henderson's defense at trial was that Keith killed Victim and that she was not at the scene. The defense argued that Keith, a self-admitted drug dealer and user (including on the night of the murder), lied to detectives and at trial about Henderson's involvement in order to save himself. Keith admitted that he initially told detectives that he did not know anything about the murder and only implicated Henderson the day after he entered his guilty plea for Victim's murder pursuant to a plea agreement. His cellmate in 2013 testified that Keith admitted killing Victim and that Henderson had only walked in on it. The defense further argued that Keith threatened Mollett, who was intellectually slow and had been diagnosed with mild mental retardation, and that detectives took advantage of and intimidated him to get his statement. While Mollett's statement to detectives put Henderson at the murder scene, it was disputed whether she attempted to participate in a drug deal with Keith or in the murder of Victim. Mollett told the detectives that as he, Henderson, and Victim played PlayStation one afternoon, Keith showed up, began arguing with Victim over money that Victim owed him, and suddenly stabbed Victim. Mollett was consistent throughout the interview that it was Keith that stabbed Victim. Henderson's cellmate, Hoard, similarly testified that Henderson told her that Keith suddenly killed Victim over an argument about pills.
The jury was not asked to determine that Henderson, Keith, or Mollett engaged in any specific conduct that would constitute the attempt, that such conduct was a substantial step toward the commission of possession of a controlled substance, or that any of them engaged in the conduct for the purpose of committing that offense. Furthermore, the jury was not asked to determine that Henderson acted with or aided or encouraged Keith or Mollett to commit attempted possession of a controlled substance. Instead, Instruction No. 8 allowed the jury to find Henderson guilty of felony murder without finding that she herself committed any of the elements of the underlying felony, either because the elements were omitted from the instruction or because they were listed in the disjunctive, or that she acted with or aided Keith or Mollett in committing the underlying felony. Instruction No. 8 was plainly erroneous because it misled the jury and failed to adequately instruct the jury on felony murder, attempt, and assessorial liability. Because the jury convicted Henderson without being required to find all of the essential elements of the offense, the errors affected the verdict and manifest injustice or miscarriage of justice resulted. Henderson's conviction for second-degree felony murder is, therefore, reversed. And because a conviction for armed criminal action can not stand without a conviction on the underlying felony, State v. White , 92 S.W.3d 183, 193 n.5 (Mo. App. W.D. 2002), her conviction for armed criminal action is also reversed.
Where convictions are reversed solely for trial error, such as the instructional error found in this case, retrial does not offend double jeopardy and is constitutionally permissible. Id. at 193. Furthermore, where, as here, the appellant requests a new trial, she cannot plead double jeopardy on retrial. Id. The case is, therefore, remanded for a new trial on *607 second-degree felony murder and armed criminal action.
Tampering with Physical Evidence Verdict Director
In her second point on appeal, Henderson asserts that the trial court erred or plainly erred in submitting Instruction No. 12, the verdict director for tampering with physical evidence. She contends that it failed to include a paragraph submitting accomplice liability as an element.
Henderson offered Instruction No. C, her verdict director for tampering with physical evidence. It provided:
Instruction No. C
A person is responsible for his own conduct and he is also responsible for the conduct of other persons in committing an offense if he acts with the other persons with the common purpose of committing that offense of if, for the purpose of committing that offense, he aids or encourages the other persons in committing it.
As to Count III, if you find and believe from the evidence beyond a reasonable doubt:
First, that between December 6, 2012 and December 8, 2012, in the County of Buchanan, State of Missouri, Kim Keith or Joshua Mollett concealed the knife used to kill Clinton Andrew Justice, and
Second, that they did so with the purpose to destroy its availability in the murder investigation of Clinton Andrew Justice, and
Third, that the concealment of the knife used to kill Clinton Andrew Justice impaired or obstructed the prosecution of Angela Renee Henderson a/k/a Mollett for the crime of murder in the second degree, and
Fourth, that with the purpose of promoting or furthering the commission of that tampering with physical evidence, the defendant acted together with or aided Kim Keith or Joshua Mollett in committing the offense, then you will find the defendant guilty under Count III of tampering with physical evidence.
However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.
The trial court refused this instruction and gave the State's Instruction No. 12. Instruction No. 12 provided:
Instruction No. 12
As to Count 3, if you find and believe from the evidence beyond a reasonable doubt:
First, that between December 6, 2012, and December 8, 2012, in the County of Buchanan, State of Missouri, the defendant or Kim Keith or Joshua Mollett concealed the knife used to stab Clinton Justice, and
Second, that they did so with the purpose to destroy its availability in the murder investigation and
Third, that the concealment of the knife used to kill Clinton Justice impaired or obstructed the prosecution of Angela Renee Henderson a/k/a Mollett for the crime of murder in the second degree, then you will find the defendant guilty under Count 3 of tampering with physical evidence.
However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.
The defense made the same objections to this instruction that it did for Instruction No. 8 above. Again, Henderson failed to specifically raise the claim she is making on appeal-the failure to include a paragraph submitting accomplice liability. The claim was not preserved for review, and she requests plain error review.
*608 As discussed above, MAI-CR 3d 304.04 is the approved instruction for accessorial liability. As in Instruction No. 8, Instruction No. 12 submitted Paragraphs First and Second in the disjunctive requiring the jury to determine if Henderson or another person, Keith or Mollett, concealed the murder weapon with the purpose to destroy its availability in the investigation. It did not, however, provide one of the alternatives such as "acted together with," "aided or encouraged," or "acted together with or aided" in a paragraph following "then you are instructed that the offense of [name of offense ] has occurred ..." as required by MAI-CR 304.04 and its Notes on Use 5(c). Thus, as submitted, Instruction No. 12 allowed the jury to find Henderson guilty of tampering with physical evidence if it found that Keith or Mollett concealed the murder weapon without any finding that Henderson acted with them or aided them in doing so. As discussed above, the version of events in this case was seriously disputed. Instruction No. 12 was plainly erroneous because it misled the jury and failed to adequately instruct it on assessorial liability. Because the jury convicted Henderson without being required to find all of the essential elements of the offense, the error affected the verdict and manifest injustice or miscarriage of justice resulted. Henderson's conviction for tampering with physical evidence is reversed, and the case is remanded for a new trial on that count.
The convictions for felony murder, armed criminal action, and tampering with physical evidence are reversed, and the case is remanded for a new trial.
All concur.

All statutory references are to RSMo 2000 as updated through the 2012 Cumulative Supplement.