IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
 STATE OF MISSOURI, )
 Respondent, )
 )
 v. ) WD83661
 )
 ANGELA R. HENDERSON, ) FILED: December 21, 2021
 Appellant. )
 Appeal from the Circuit Court of Buchanan County
 The Honorable Daniel F. Kellogg, Judge
 Before Division One: W. Douglas Thomson, P.J.,
 and Alok Ahuja and Karen King Mitchell, JJ.
 Angela Henderson was charged in the Circuit Court of Buchanan County

with second-degree murder, armed criminal action, and tampering with physical

evidence. The charges arose from a murder in St. Joseph in December 2013.

Henderson was convicted of all three counts following a jury trial in July 2016. This

Court reversed Henderson’s convictions due to instructional error, State v.

Henderson, 551 S.W.3d 593 (Mo. App. W.D. 2018), and a second jury trial was held

in January 2020. The second trial again resulted in Henderson’s conviction on all

three counts, and the circuit court sentenced her to consecutive terms of life

imprisonment for murder, twenty-five years’ imprisonment for armed criminal

action, and three years for evidence tampering.

 Henderson appeals. She argues that the circuit court erroneously admitted

the out-of-court statements of her adult son as a “vulnerable person” under

§ 491.075, RSMo, when the court had found him incompetent to testify at trial due
to mental incapacity under § 491.060(1), RSMo. Henderson also contends that the
court erred by failing to dismiss a juror, after Henderson presented evidence that

the juror had purportedly engaged in non-verbal communication with members of

the murder victim’s family in the gallery. We affirm.

 Factual Background
 Clinton (“Sam”) Justice (the “Victim”) lived in an apartment in St. Joseph.

The Victim was murdered in his apartment in early December 2012.

 Henderson dated the Victim “on-again, off-again” for seventeen years prior to

his death. Henderson’s son, Joshua Mollett, was in his early 20s at the time of the
Victim’s murder, and spent a lot of time with him.

 Kim Keith testified against Henderson at both her first and second trials.

The evidence indicated that Henderson had begun a romantic relationship with

Keith approximately three months before the Victim’s murder. Keith was a drug

dealer, who sold methamphetamine and other drugs. He was also addicted to

methamphetamine. Keith pleaded guilty to second-degree murder for the Victim’s

murder and was serving a fifteen-year sentence. As a condition of his plea

agreement, he was required to testify truthfully against Henderson.

 Keith testified that late on the night of Friday, December 7, 2012, or in the

early morning hours of Saturday, December 8, he received a call from Henderson,

indicating that she wanted to buy an eighth of an ounce of methamphetamine from

Keith for $300. When Keith met with Henderson, she was accompanied by Mollett,

whom Keith had known since Mollett was a child. Henderson and Mollett did not

have the money to buy the drugs, so Keith accompanied them in their car to the

Victim’s apartment building, so that Henderson could get the necessary money from

him.

 Keith testified that Henderson initially went in to the Victim’s apartment

alone, while Keith and Mollett waited in the car. After waiting for several minutes,
Keith and Mollett went to the Victim’s apartment.

 2
 Keith testified that the Victim refused to give Henderson money for her to

purchase methamphetamine from Keith. Keith testified that, on a signal from

Henderson, Mollett walked behind the Victim and pulled his head back. Henderson

then cut the Victim across the throat with a knife.

 Because she had not heard from the Victim, one of his daughters and her

husband went to his apartment on the evening of December 8 to check on him.

They found the Victim lying face down in a pool of blood in front of the recliner in

the living room. After not finding a pulse, the daughter’s husband called 911.

 When police arrived, they found that the Victim had wounds to his neck,

chest, and right thumb. He had one sock on and one off. A bloody sock was stuck to

the wounds on his neck. The Victim had blood on the bottom of his bare foot and on

the bottom of the sock on the other foot. Police found blood and bloody footprints on

the carpet from the recliner to the front door and smears of blood on the front door.

The recliner’s right armrest was also saturated with blood. Blood splatter patterns

indicated that the Victim’s injuries had occurred in front of the recliner.

 The Victim had been stabbed in the upper chest, striking a rib and cutting

his carotid artery. A knife wound to the Victim’s neck sliced the jugular vein and

created a small hole in the trachea. In addition to the neck and chest wounds, the
Victim had a defensive wound to his right thumb. He died from massive blood loss.

 According to his daughters, the Victim was meticulous about his apartment

and kept it very clean at all times. Although he no longer smoked, the Victim

allowed others to smoke in his apartment. His daughters testified, however, that

the Victim would always empty and wash the ashtrays immediately after his guests

were done smoking. Police found three cigarette butts in an ashtray in the living

room of the Victim’s apartment. Henderson’s DNA was found on one of the butts.

Mollett’s DNA was found on the other two cigarette butts, and on a cup found in the
apartment. Given the Victim’s housekeeping habits, the presence of these cigarette

 3
butts suggested that Henderson and Mollett had been in the Victim’s apartment

shortly before his murder.

 Henderson spoke with police twice shortly after the Victim’s body was found,

and gave them inconsistent stories about when she had last seen him. Henderson

denied that she was present when the Victim was murdered.

 Becky Osborn was a close friend of the Victim’s family, and also knew

Henderson and Mollett well. In March 2013, almost four months after the murder,

Osborn saw Mollett and Henderson in her old neighborhood. When Henderson

went into a building, Osborn spoke to Mollett about what he had witnessed on the

day of the murder. Mollett “just kind of emotionally broke down.” He told Osborn

that he and Henderson were present when Keith killed the Victim. Osborn then

contacted the investigating detective and told him what she had just heard.

 On April 2, 2013, police arrested Henderson and Mollett and interviewed

them separately. Mollett told detectives that he and Henderson were at the

Victim’s apartment one afternoon when Keith called Henderson and showed up

shortly thereafter. About twenty to thirty minutes later, Keith and the Victim

began arguing because the Victim said he did not have money that he owed Keith

for drugs. Mollett said that he saw Keith stab the Victim in the neck. He said that
after being stabbed in the neck, the Victim attempted to use a sock to staunch the

blood flow and save himself, but it was too late. (The police had closely guarded the

fact that the Victim had used one of his socks in this manner.) Mollett said that

Keith gave him the murder weapon, a distinctive “scorpion” knife belonging to the

Victim. Mollett and Henderson left walking in one direction and Keith in another.

After walking approximately twenty minutes, Henderson told Mollett to dispose of

the knife, so he threw it in some bushes. The knife was later located by two men in

their side yard and retrieved by police. The Victim’s DNA was found on the blade of
the knife.

 4
 In her interview that day, Henderson told detectives that she did not know

Keith at the time of the murder but started dating him in January 2013. She said

that after she broke up with Keith in February, Mollett told her that Keith had

admitted to killing the Victim.

 In July 2013, a psychologist and certified forensic examiner conducted a

competency examination of Mollett in connection with his own criminal prosecution.

The psychologist diagnosed him with mild mental retardation, with deficits in

reasoning, problem solving, abstraction, and judgment. A general adult psychiatrist

at Family Guidance Center testified that Mollett had been a patient there for

various mental illnesses between 2001 and 2012. During his time at the Center,

Mollett had been diagnosed with bipolar mood disorder Type 1, attention-deficit/

hyperactivity disorder (ADHD), and either borderline intellectual functioning (IQ

between 71 and 84) or mild mental retardation (IQ between 55 and 70). Mollett was

found incompetent to stand trial in his own prosecution in July 2014. The charges

against him were ultimately dismissed without prejudice, and he was committed to

a mental-health facility.

 While in the Buchanan County jail, Henderson was recorded on October 23,

2013, saying during a phone call, “They have charged [Mollett] with robbery. Why
did they charge him with robbery?” A female on the other end of the line said,

“They say he took [the Victim’s] pills.” Henderson responded, “No. I know who took

– who got [the Victim’s] pills.” The unknown female said, “You need to shut the f***

up.” Henderson was recorded during a later call asking a female on the other end,

“You got the paperwork that I sent you in the yellow envelope?” The female asked

“What paperwork is that?” Henderson replied in a low voice, “Testimony. Yours.”

The female responded, “Well, yeah, I got everything you sent me.”

 On January 28, 2015, the State moved for the circuit court to enter an order
allowing Mollett to testify at Henderson’s first trial. In the alternative, the State

 5
requested that, if the circuit court found Mollett to be incompetent, that the court

allow his out-of-court statements to be admitted under §491.075, RSMo. The circuit

court denied the State’s motion to allow testimony from Mollett, finding that Mollett

was incompetent to testify due to mental incapacity under § 491.060(1), RSMo. The

circuit court scheduled a hearing on March 9, 2015, to determine if Mollett’s out-of-

court statements to Rebecca Osborn and Detectives Gregg Lewis and Scott Coates

were admissible. During the hearing, the court heard testimony from Osborn, and

from Detectives Lewis and Oates, regarding the statements made by Mollett and

the circumstances in which those statements occurred. The court also received a

number of exhibits into evidence, including a video recording of Mollett’s police

interrogation, a transcript of Mollett’s January 15, 2015 deposition, and reports of

two forensic evaluations conducted in Mollett’s own criminal prosecution.

 On March 18, 2015, the circuit court ruled that Mollett’s out-of-court

statements made to Osborn and Detectives Lewis and Coates were admissible

under § 491.075.

 The jury in Henderson’s first trial found her guilty of second-degree felony

murder, armed criminal action, and tampering with physical evidence. The trial

court sentenced her as a prior and persistent offender to consecutive terms of life,
twenty-five years, and three years’ imprisonment, respectively.

 Henderson appealed. We reversed her convictions based on instructional

error, and remanded the case for retrial. State v. Henderson, 551 S.W.3d 593 (Mo.

App. W.D. 2018).

 In a pretrial hearing on January 23, 2020, the circuit court ruled that it

would adhere to its previous rulings that Mollett was “a vulnerable person and also

. . . unavailable[le] because of his mental capacity, incapacity, and all. So the Court

is going to stand by the rulings that were made previously.”

 6
 On the third day of Henderson’s retrial, the circuit court interviewed Jurors

18 and 33 regarding an incident in which Juror 18 witnessed a person in the gallery

who was associated with Henderson pointing to the jury and saying words to the

effect of “she’s stupid.” Juror 18 told Juror 33 what she had seen, and Juror 33

suggested that Juror 18 speak with the bailiff about it. When the circuit court

asked if hearing about the incident from Juror 18 would affect Juror 33’s ability to

be unbiased, Juror 33 responded that “[e]verybody handles difficult situations

differently. Some people try to cover it up with humor, or you know what I’m

saying? They find a coping mechanism to deal with a very difficult situation.” The

circuit court found that there was no risk of bias from the interaction.

 On the next day (the last day of trial) Megan Cogdill, a friend of Henderson’s

daughter, reported that she had seen Juror 33 making eye contact, winking, and

smirking at a member of the Victim’s family in the gallery. The circuit court did not

question Juror 33 about Cogdill’s accusations. The court refused to remove Juror 33

from the jury. The court stated that Juror 33 had “made a very good record on

about she knows [how] emotions run, and so she’s pretty much trying to keep an

even keel through all of this.”

 The jury in Henderson’s second trial once again found her guilty on all three
counts. The circuit court again sentenced her to consecutive terms of life

imprisonment, twenty-five years, and three years.

 Henderson appeals.

 Discussion
 Henderson asserts two Points Relied On. In the first, she argues that the

circuit court erred in admitting Mollett’s out-of-court statements under § 491.075,

RSMo, because those statements did not bear “sufficient indicia of reliability” under

§ 491.075.1(1), given the court’s finding that Mollett was incompetent to testify due
to mental incapacity under § 491.060(1), RSMo. In her second Point, Henderson

 7
challenges the circuit court’s refusal to dismiss Juror 33 after Henderson’s

accusation that Juror 33 had committed misconduct by engaging in nonverbal

communication with members of the Victim’s family.

 I.
 Henderson’s first Point contends that Mollett’s out-of-court statements could

not bear “sufficient indicia of reliability” under § 491.075.1(1), RSMo, because the

court had found Mollett to be incompetent as a witness under § 491.060(1), RSMo.

Henderson essentially argues that out-of-court statements cannot be admitted from
any person declared to be incompetent under § 491.060(1), RSMo, because – as a

matter of law – such statements cannot be found sufficiently reliable under

§ 491.075.1(1), RSMo.

 At the outset, the State argues that we should not consider Henderson’s

challenge to the admissibility of Mollett’s out-of-court statements, because those

statements were admitted in Henderson’s first trial, and she did not challenge the

admissibility of Mollett’s statement in her first appeal. According to the State, the

admissibility of those statements is the “law of the case,” which Henderson cannot

now challenge.

 The law of the case doctrine provides that the previous holding
 in a case constitutes the law of that case and precludes re-litigation of
 the same issue in a subsequent appeal. The doctrine not only
 precludes re-litigation of claims that were actually raised in a prior
 appeal, but also any claims that arose prior to the first adjudication
 and might have been raised but were not. Pursuant to this doctrine,
 the failure to raise a claim in a prior appeal means that the court
 hearing a subsequent appeal need not consider the claim. But
 appellate courts do have discretion to consider an issue where there is
 a mistake, a manifest injustice or an intervening change in the law.
State v. Kelly, 43 S.W.3d 343, 347 (Mo. App. W.D. 2001) (citations omitted); see also

State v. Deck, 303 S.W.3d 527, 545 n.2 (Mo. 2010).

 8
 We are not aware of any Missouri decision applying the “law of the case”

doctrine to an evidentiary ruling made in a prior trial, in circumstances similar to

this case – where Henderson won a reversal of her conviction in her first trial, and

therefore it would not have been necessary for this Court to address the evidentiary

issue, even if she had raised it. Evidentiary rulings are generally understood to be

dependent on the specific context in which the evidentiary issues arise during trial.

Thus, it is well-established in Missouri law that a trial court’s pretrial limine

rulings are only interlocutory, and that “[a]dditional information produced at trial

may prompt the trial court to alter its pretrial ruling.” Elliott v. State, 215 S.W.3d

88, 92 (Mo. 2007) (citation omitted); see also, e.g., State v. Evans, 517 S.W.3d 528,

543 n.9 (Mo. App. S.D. 2015) (despite a pretrial limine ruling concerning the

admissibility of evidence, trial judges must “be given an opportunity to reconsider

their prior rulings against the backdrop of the evidence actually adduced [during

the trial itself,] and in light of the circumstances that exist when the questioned

evidence is actually proffered”). We therefore question whether evidentiary rulings

made in the context of an earlier trial would generally constitute the “law of the

case” binding the court and the litigants in a subsequent retrial, where the relevant

evidentiary context may be materially different.
 We recognize that, in Deck, the Missouri Supreme Court applied the “law of

the case” doctrine to an evidentiary ruling from a prior trial. 303 S.W.3d at 545.

But in Deck, in an earlier appeal the Supreme Court affirmed a jury verdict finding

the defendant guilty of capital murder in his first trial; in the course of affirming,

the Court specifically rejected the evidentiary argument which the defendant sought

to renew in a later appeal (the later appeal was taken after a jury reimposed the

death penalty in a penalty-phase retrial). See State v. Deck, 994 S.W.2d 527, 535-36

(Mo. 1999). This case is distinguishable – in Henderson’s prior appeal this Court
vacated the result of her first trial, without addressing the admissibility of Mollett’s

 9
statements. Moreover, we also note that Henderson’s objections to the admission of

Mollett’s out-of-court statements in her second trial depended, at least in part, on

the circuit court’s refusal to permit Henderson to re-depose Mollett, or subpoena

him to testify at trial. Those circumstances did not exist at the time of Henderson’s

earlier appeal.

 We need not definitively decide whether Henderson’s first Point is precluded

by the “law of the case” doctrine, however, because her Point lacks merit in any

event. We emphasize at the outset what Henderson’s first Point does not argue.

Henderson does not challenge the circuit court’s determination that Mollett was

incompetent as a witness due to mental incapacity within the meaning of

§ 491.060(1), RSMo. Nor does Henderson challenge the circuit court’s

determination that, because Mollett was incompetent to testify, he was therefore

“unavailable as a witness” within the meaning of § 491.075.1(2)(b), and thus his out-

of-court statements could be admitted under § 491.075 despite Mollett’s failure to

testify at Henderson’s trial. Further, Henderson does not argue that the admission

of Mollett’s statements independently violated Henderson’s rights under the

Confrontation Clause found in the Sixth Amendment to the United States

Constitution. Although Henderson’s Brief cites the Confrontation Clause and
caselaw applying it, her only argument concerning the Confrontation Clause asserts

that her confrontation rights were violated because Mollett’s statements were

inadmissible under § 491.075.1(1), RSMo. Thus, her Confrontation Clause

argument is derivative of her argument that Mollett’s statements were inadmissible

because they lacked “sufficient indicia of reliability” under § 491.075.1(1).

 Even with respect to the “reliability” question, Henderson’s argument is

limited. Generally, the “reliability” inquiry requires a court to consider all of the

facts and circumstances surrounding a child’s or a vulnerable person’s out-of-court
statement.

 10
 For purposes of § 491.075, courts determine the reliability of a child's
 out-of-court statements by evaluating the totality of the circumstances.
 In evaluating the totality of the circumstances, the court considers a
 non-exclusive list of factors, including: (1) spontaneity and consistent
 repetition; (2) the mental state of the declarant; (3) the lack of motive
 to fabricate; and (4) knowledge of subject matter unexpected of a child
 of similar age. Interviewing techniques are also an important factor to
 be considered as part of the court's totality of the circumstances
 analysis.
State v. Barker, 410 S.W.3d 225, 232-33 (Mo. App. W.D. 2013) (citations and

internal quotation marks omitted).

 In this case, to assess reliability under the totality-of-the-circumstances

standard, this Court would be required to consider the testimony offered by Osborn,

and by Detectives Lewis and Coates, at the § 491.075 hearing conducted before

Henderson’s first trial, as well as the exhibits admitted at that hearing (which

included a video recording of Mollett’s police interrogation, the transcript of his

January 2015 deposition, as well as reports of two competency examinations).

Henderson’s briefing does not describe the circumstances surrounding Mollett’s out-

of-court statements in any detail, nor has she provided this Court with the exhibits

admitted at the § 491.075 hearing. Although Henderson’s Brief states that “the

evidence adduced at the 491 hearing [failed to] demonstrate[ ] that Josh’s

statements demonstrated sufficient indicia of reliability necessary under Section
491.075,” Henderson fails to discuss any of the evidence from the § 491.075 hearing

in her argument, or otherwise support her conclusory assertion that the evidence

was somehow insufficient to establish reliability. Rather than challenging the

circuit court’s conclusion that Mollett’s statements were reliable in light of the

totality of the circumstances, Henderson makes a more categorical argument: that

Mollett’s out-of-court statements lack “sufficient indicia of reliability” – as a matter

of law – because Mollett was declared to be “incompetent to testify” under
§ 491.060(1), RSMo.

 11
 Henderson offers minimal argument that a finding of incompetency because a

witness is “mentally incapacitated at the time of his or her production for

examination” under § 491.060(1), RSMo, necessarily equates to a finding that the

witness’ out-of-court statements lack “sufficient indicia of reliability” under

§ 491.075.1(1), RSMo. Although Henderson essentially asks this Court to find the

two standards to be equivalent, her briefing does not even cite caselaw interpreting

the standards applied under the two statutes.

 We do not find any necessary link between the two statutory standards. The

definition of “vulnerable person” in § 491.075.5, RSMo, includes a “person who, as a

result of an inadequately developed or impaired intelligence or a psychiatric

disorder that materially affects ability to function, lacks the mental capacity to

consent.” Plainly, the General Assembly understood that the “vulnerable persons”

whose extrajudicial statements would be admissible might include persons with

seriously impaired intellectual or cognitive functioning – yet it authorized the

admission of statements from such “vulnerable persons” nonetheless. Further, we

note that in State v. Chandler, 429 S.W.3d 503, 507 (Mo. App. E.D. 2014), the

Eastern District held that a finding that an individual was a “vulnerable person”

under § 491.075.5, RSMo, did not mandate a finding that the individual was
incompetent to testify under § 491.060(1) – thus suggesting that the two standards

are not identical.

 Moreover, caselaw interpreting the competency standard found in

§ 491.060(1), RSMo suggests several features of the competency inquiry which may

not be relevant to the reliability of an extrajudicial statement under § 491.075.1(1).

For example, § 491.060(1) refers to an individual’s mental capacity “at the time of

his or her production for examination.” (Emphasis added.) Thus, the competency

question focuses on a putative witness’ mental state at the time their testimony is
sought. For this reason, “[a] prior adjudication of mental incompetence or a record

 12
of confinement in a mental hospital is not conclusive.” State v. Robinson, 835

S.W.2d 303, 307 (Mo. 1992) (quoting State v. Beine, 730 S.W.2d 304, 307-08 (Mo.

App. E.D. 1987)); accord State v. Newton, 963 S.W.2d 295, 297 (Mo. App. E.D. 1997).

In this case, Mollett’s extrajudicial statements were made in March and April 2013,

while the circuit court first ruled him incompetent to testify in February 2015 –

almost two years later. Notably, in arguing that the circuit court should revisit its

determinations about Mollett’s competency prior to the retrial, defense counsel

himself emphasized that the passage of time could be relevant to the competency

determination:

 [A]s we stand here today, we – three years have passed, almost four
 years have passed, Your Honor, since the last trial. And as we stand
 here today, we don't know how vulnerable Joshua is. We don't know
 what the impact of his testimony might have on him psychologically or
 otherwise.
A witness’ competence to testify, years after making extrajudicial statements, does

not necessarily govern the reliability of the earlier statements themselves.

 Besides the time lapse between Mollett’s extrajudicial statements and the

court’s ruling finding him incompetent as a witness, the competency standard also

involves consideration of factors which do not easily translate to the “reliability”

inquiry required by § 491.075.1(1), RSMo.
 A witness is competent to testify if the witness shows “(1) a present
 understanding of, or the ability to understand upon instruction, the
 obligation to speak the truth; (2) the capacity to observe the occurrence
 about which testimony is sought; (3) the capacity to remember the
 occurrence about which testimony is sought; and (4) the capacity to
 translate the occurrence into words.”
Robinson, 835 S.W.2d at 307 (quoting State v. Feltrop, 830 S.W.2d 1, 10 (Mo. 1991));

see also Newton, 963 S.W.2d at 297. The one forensic evaluation report contained in

the record on appeal reflects that Mollett was able to converse with the examiner
concerning his possible upcoming trial, but that he had limited understanding of the

 13
manner in which the criminal proceeding would be conducted, or concerning the

roles of various trial participants. The circuit court may well have found Mollett

incompetent to testify as a witness based on his inability to understand the

obligation of a witness to comply with their oath and testify truthfully – not based

on any inability to observe, remember, or relate events.

 Finally, the caselaw involving competency provides that, if an individual is

confined to a mental-health facility at the time of a competency determination (as

Mollett was), then that individual will be presumed to be incompetent, and the

burden falls on the proponent of their testimony to prove otherwise. Robinson, 835

S.W.2d at 307. The circuit court’s competency determination may reflect only that

Henderson failed to carry her burden to prove him to be competent.

 For the foregoing reasons, we reject Henderson’s argument that the circuit

court’s finding that Mollett was incompetent to testify under § 491.060(1), RSMo,

necessarily meant that his extrajudicial statements were unreliable, and therefore

inadmissible under § 491.075, RSMo. Point I is denied.

 II.
 Henderson’s second Point argues that the circuit court abused its discretion

in failing to dismiss Juror 33 from the jury panel, when Henderson presented

testimony from a family friend who was attending the trial that Juror 33 had been

making eye contact, winking, and smirking at members of the Victim’s family in the

courtroom gallery.

 “[T]rial court decisions regarding alleged juror misconduct will not be

disturbed on appeal absent a finding of abuse of discretion.” State v. Hicks, 959

S.W.2d 119, 122 (Mo. App. S.D. 1997) (citing State v. Brown, 939 S.W.2d 882, 883

(Mo. 1997)). If jury misconduct is found, the State must “‘affirmatively sho[w] that

the jurors were not subject to improper influences.’” State v. Chambers, 891 S.W.2d
93, 102 (Mo. 1994) (quoting State v. Babb, 680 S.W.2d 150, 151 (Mo. 1984)).

 14
However, “juror misconduct must first be established by the defendant.” Hicks, 959

S.W.2d at 122 (citation omitted).

 The circuit court has the responsibility to “determin[e] the existence of bias or

prejudice with regard to a juror.” Id. at 123. Missouri law “does not always require

juror testimony once misconduct is alleged.” Chambers, 891 S.W.2d at 101. In

Chambers, the Missouri Supreme Court held that a circuit court had not abused its

discretion in rejecting a new-trial motion when the defendant presented testimony

that jurors had been overheard speaking about the defendant’s previous conviction

for murder. Id. Similar to this case, the trial judge in Chambers did not receive

testimony from any of the affected jurors before denying the defendant’s motion for

new trial. Id.

 The circuit court did not err in rejecting Henderson’s motion to remove Juror

33. The circuit court was entitled to reject the testimony of Cogdill, a family friend

of Henderson’s, without calling Juror 33 to testify again. As the prosecutor argued

in response to Henderson’s motion, no one else in the courtroom had apparently

seen the non-verbal communication which Cogdill claimed to have witnessed.

Moreover, the circuit court had examined Juror 33 on the prior day concerning a

separate issue, and found her to have been perceptive concerning the stakes at issue
in the trial, and as someone who was “trying to keep an even keel” during the

emotionally charged proceeding. In light of the court’s own observation of Juror 33,

it was entitled to disbelieve Cogdill’s testimony that Juror 33 had engaged in

improper behavior.

 Further, even if the court had believed Cogdill’s testimony, there is no

evidence that any eye contact between Juror 33 and a member of the audience was

a comment on the merits of the trial. This Court has held that a circuit court does

not abuse its discretion when it allows a juror to remain after that juror had a
conversation with a prosecution witness that, “while improper, was casual, brief

 15
and totally unrelated to anything associated with the trial.” State v. Lasley, 731

S.W.2d 357, 360 (Mo. App. E.D. 1987) (citing State v. Martin, 624 S.W.2d 879, 882

(Mo. App. E.D. 1981)). Cogdill testified that she witnessed Juror 33 in her

peripheral vision, “making . . . eye contact . . . winked, kind of smirked” in the

direction of the side of the courtroom where the Victim’s family was sitting. Cogdill

could not say who, specifically, Juror 33 may have been looking at, and she

admitted that she did not know the exact positioning of the Victim’s family in the

courtroom: “I try not to look at them. I try out of respect not to look at them or

associate with them.” Cogdill’s testimony was not specific enough to determine if

Juror 33’s purported facial expressions constituted improper communication

concerning the merits of the case. The evidence produced by Henderson did not

require the circuit court to exercise its discretion to dismiss Juror 33, even if the

court believed that evidence.

 Point II is denied.

 Conclusion
 The judgment of the circuit court is affirmed.

 Alok Ahuja, Judge
All concur.

 16