

# In the Missouri Court of Appeals
## Eastern District

### DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED112519 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | Cause No. 2322-CR00472-01 |
| | ) | |
| JEFFERY LUMZY, | ) | Honorable Rex M. Burlison |
| | ) | |
| Appellant. | ) | FILED: May 6, 2025 |

Opinion

Jeffery Lumzy (Lumzy) appeals from the trial court's judgment following a jury trial

convicting him on murder in the first degree, armed criminal action, burglary in the first degree,

unlawful possession of a firearm, and stealing of a motor vehicle. Lumzy raises four points on

appeal. Points One and Two allege the trial court abused its discretion by admitting evidence of

text messages allegedly sent by Lumzy to A.W. (Outgoing Texts) and received by Lumzy from

D.P. (Incoming Text) (collectively, Text Messages) without proper foundation.[1] Point Three

contends that the trial court abused its discretion by admitting evidence of Lumzy attempting to

kidnap D.P. and her children for which he was not charged. Finally, in Point Four, Lumzy

alleges that trial court plainly erred by providing the jury with the State's proffered first-degree

burglary verdict director, in that the instruction contained the definition of assault from the civil

---

[1] All names are redacted pursuant to § 509.520, RSMo (Cum. Supp. 2023).

Adult Abuse Act,[2] rather than the criminal code's definition of assault, hence lowering the State's burden of proof.

Because the State laid an adequate foundation for the admission of Text Messages, we deny Points One and Two. Because the kidnapping-related evidence was highly probative of the circumstances and sequence of events surrounding the charged conduct, we deny Point Three. Lastly, because the State's burden of proof for first-degree burglary was not lowered by the verdict director, which accurately tracked the Missouri Approved Instructions–Criminal (MAI-CR) 4th (2022), the trial court did not err plainly or otherwise in providing that instruction, thus we deny Point Four. Accordingly, we affirm the trial court's judgment.

Background

Viewed in the light most favorable to the verdict,[3] the evidence at trial showed:

On or about December 29, 2022, Lumzy was living with his paramour A.W. and their three children in the same neighborhood as D.P., with whom Lumzy also had three children. That morning, D.P. sent Lumzy Incoming Text stating that she was "washing [her] hands of him" and would "rather deal with child support." D.P.'s friend, Victim, then came to visit D.P. at her apartment. While the two were conversing, Lumzy entered through the unlocked front door unannounced and uninvited. D.P. sternly ordered him to leave. Lumzy left the apartment but returned approximately ten minutes later at the back door, holding a black gun. He entered, flashed the gun at D.P., then shot Victim in the chest. D.P. then tried to call 911, but Lumzy took her phone from her. He ordered her to find clothes for the children and stated that they all would be leaving. While D.P. was getting the children ready, she testified that Lumzy got on his phone and called someone. At no point did Lumzy render any aid to Victim nor allow D.P. to do

---

[2] § 455.010, *et seq.*, RSMo (2016).
[3] *State v. Scott*, 676 S.W.3d 336, 339 (Mo. App. E.D. 2023).

2

so. Lumzy then took D.P.'s car key and took D.P. and the children across the parking lot to D.P.'s rental car. At this point, the apartment Maintenance Technician noticed D.P. calling for help and observed D.P. and her children crying, while Lumzy was smiling—an interaction which was captured on surveillance video. Maintenance Technician called 911 because it appeared to him that Lumzy was kidnapping the children. Maintenance Technician approached Lumzy asked what was going on, and D.P. again asked for help and stated that Lumzy had shot her friend. Maintenance Technician warned Lumzy that he would be calling the police. Lumzy then got into D.P.'s car and, with D.P.'s phone in his possession, drove off in the direction of A.W.'s residence. Evidence was adduced that Lumzy purportedly sent two Outgoing Texts to A.W., just thirty minutes prior to being confronted by Maintenance Technician in the parking lot. The Outgoing Texts stated: "I'm about to go to jail for a long time" and "Call me 911." After Lumzy left in D.P.'s vehicle, D.P., children, and Maintenance Technician returned to D.P.'s apartment, where emergency responders arrived on scene.

After the shooting, Lumzy hid the firearm used to shoot Victim at the home of A.G., another paramour with whom he had two children. Surveillance video from a nearby intersection depicted Lumzy speeding westward in D.P.'s car toward A.G.'s residence. A.G. testified that Lumzy had stored two guns in her nightstand in late December 2022. In the top drawer of the nightstand was a Smith & Wesson 9 mm pistol as well as two magazines. In the bottom drawer of the nightstand was an SAR 9 mm semiautomatic pistol, a holster, and a 15-round magazine with 14 rounds in it. The chamber did not have a bullet. After disposing the guns, Lumzy abandoned D.P.'s vehicle in a parking lot. He fled to Chicago, where he remained until he was arrested approximately two months after the crimes.

3

The State charged Lumzy as a prior and persistent offender with murder in the first degree, armed criminal action, burglary in the first degree, six counts of kidnapping in the second degree, unlawful possession of a firearm, and stealing of a motor vehicle without consent. Before trial, the State entered a memorandum of nolle prosequi dismissing the kidnapping charges.

At trial, the State called D.P. to testify regarding the above facts. While on the stand, D.P. testified to having sent Incoming Text to Lumzy on the morning of the shooting about pursuing child support from him and breaking off contact with him. The State then called a homicide detective for the St. Louis Metropolitan Police Department (Detective), who testified about the investigation. While Detective was on the stand, the State offered into evidence both Outgoing Texts to prove Lumzy's guilty consciousness and Incoming Text to show that Lumzy was angry with D.P. on the day of the shooting. Detective testified that the Text Messages were extracted from a Cellebrite Report conducted on Lumzy's phone, which was recovered from D.P.'s apartment where Lumzy left it charging in the kitchen and was searched pursuant to a warrant. Lumzy separately objected to both Text Messages on foundation grounds, arguing the State had not proven authorship. Lumzy suggested someone else might have had the phone and sent the texts. With respect to Incoming Text, the State pointed out that D.P. had already testified that she texted Lumzy regarding child support and breaking off contact. The trial court overruled Lumzy's objections, reasoning that the State would be laying a proper foundation through additional evidence and that Lumzy's argument would go to the weight of the evidence accorded by the jury. The State proceeded to offer A.W.'s T-Mobile phone records and Lumzy's AT&T phone records into evidence to establish the ownership of both phone numbers involved with Outgoing Texts.

4

The State also offered into evidence Exhibit 1 (911 Call), Exhibits 4, 4A, and 4B (Surveillance Footage), and Exhibit 5 (Still Image) (collectively, Kidnapping Evidence). Lumzy objected to 911 Call, wherein Maintenance Man reported Lumzy's perceived kidnapping conduct, arguing it was inadmissible evidence regarding bad acts for which he was not charged. The State countered that "the fact that the caller thought [Lumzy] was kidnapping the kids was part of his plan to evade detection for the murder." The trial court agreed with the State and overruled the objection. 911 Call was then played for the jury.

Lumzy later sought a continuing objection to Surveillance Footage and Still Image, which also contained evidence relating to the kidnapping conduct. The State argued the evidence from Surveillance Footage and Still Image of Lumzy leaving the scene of the murder and stealing D.P.'s vehicle on his way to hide the guns at A.W.'s home was relevant to proving consciousness of guilt and flight. Lumzy countered that the portions of Surveillance Footage and Still Image depicting D.P. and the children should be removed because these, specifically, were more prejudicial than probative and were evidence of kidnapping, not evidence of murder or stealing. The trial court overruled all of Lumzy's objections to the Kidnapping Evidence, finding the challenged portions of Surveillance Footage and Still Image were close in time to the murder and gave a complete picture of the whole event. Lumzy testified in his own defense. He admitted he shot Victim but claimed he did so in self-defense. While on the stand, he also admitted to sending Outgoing Texts and receiving Incoming Text.

The trial court held a jury instruction conference, during which Lumzy objected to the State's proffered verdict director for burglary in the first degree (Instruction No. 19), which modeled MAI-CR 423.52 and was accepted by the trial court. It read:

5

INSTRUCTION NO. 19

As to Count III, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about December 29, 2022, in the State of Missouri, the defendant knowingly remained unlawfully in an inhabitable structure located at [D.P.'s address] and possessed by [D.P.], and

Second, that the defendant did so for the purpose of committing the offense of assault therein, and

Third, that while the defendant was in the inhabitable structure he caused immediate physical injury to [decedent], and that [decedent] was not a participant in the offense, then you will find the defendant guilty under Count III of burglary in the first degree.

A person commits the crime of assault when he or she purposefully or knowingly places or attempts to place another in fear of physical harm.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

As used in this instruction, a person acts knowingly, with respect to his conduct or to attendant circumstances when the person is aware of the nature of his or her conduct or that those circumstances exist, or with respect to a result of a person's conduct when he is aware that his or her conduct is practically certain to cause that result.

A person "enters unlawfully or remains unlawfully" in or upon premises when he or she is not licensed or privileged to do so. A person who, regardless of his or her purpose, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he or she defies a lawful order not to enter or remain personally communicated to him or her by the owner of such premises or by other authorized person. A license or privilege to enter or remain in a building which is only partly open to the public is not a license or privilege to enter or remain in that part of the building which is not open to the public.

Lumzy's rejected instruction was identical except for including the word "immediate" in the paragraph that defined assault: "A person commits the crime of assault when he or she purposely or knowingly places or attempts to place another in fear of ***immediate*** physical harm." (Emphasis added). Lumzy conceded that Instruction No. 19 followed the MAI-CR, which uses the definition of assault from the civil domestic abuse statute, but maintained that use of that definition improperly lowered the State's burden of proof because the domestic abuse statute is not criminal in nature. The trial court rejected Lumzy's proffered instruction and proceeded to instruct the jury on the charged offenses and Lumzy's self-defense claim.

6

At the close of trial, the jury found Lumzy guilty on all tried charges. The trial court sentenced Lumzy to consecutive sentences of life imprisonment without the possibility of parole for murder in the first degree and fifteen years for armed criminal action, as well as concurrent sentences of twenty years for burglary, ten years for unlawful possession of a firearm, and ten years for stealing. This appeal follows.

<u>Discussion</u>

## I. Points One and Two—The Trial Court Did Not Abuse its Discretion in Admitting Text Messages

### A. Standard of Review

"A trial court enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal." *State v. Johnson*, 690 S.W.3d 928, 930-31 (Mo. App. E.D. 2024) (quoting *State v. Carpenter*, 605 S.W.3d 355, 358-59 (Mo. banc 2020)). Whether sufficient foundation has been laid to admit evidence is also a "decision within the broad discretion of the trial court." *State v. Pendergraft*, 688 S.W.3d 762, 765 (Mo. App. W.D. 2024) (quoting *State v. Minner*, 256 S.W.3d 92, 97 (Mo. banc 2008)). A trial court will be found to have abused its discretion when "a ruling is clearly against the logic and circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Samsinak*, 688 S.W.3d 259, 266 (Mo. App. S.D. 2024) (citing *State v. Brandolese*, 601 S.W.3d 519, 533 (Mo. banc 2020)). "To prove reversible error, the appellant must show both an abuse of discretion and prejudice." *Piers v. Dep't of Corr.*, 688 S.W.3d 65, 73 (Mo. App. W.D. 2024) (internal citation omitted). "An error is prejudicial only if it 'caused outcome-determinative prejudice materially affecting the merits of the action.'" *Id.* (internal quotation omitted).

For ease of analysis, we discuss Lumzy's Point One and Two together. Lumzy argues the trial court abused its discretion in admitting Outgoing Texts and Incoming Text (together, Text Messages) because they were not properly authenticated. We disagree. Text Messages were properly admitted into evidence. They were sufficiently authenticated through circumstantial evidence in the record at the time both Outgoing and Incoming Texts were offered. Moreover, the author of Incoming Text, D.P., testified to her authorship, and Lumzy testified to authoring Outgoing Texts.

B.      Authenticating Text Messages Generally

Authenticating text messages requires that "[t]he party seeking admission of this evidence show [that] the messages were actually written by the person who allegedly sent them." *State v. Hein*, 553 S.W.3d 893, 897 (Mo. App. E.D. 2018) (citing *State v. Harris*, 358 S.W.3d 172, 175 (Mo. App. E.D. 2011)). This is because "[t]he authenticity of a document cannot be assumed, but what it purports to be must be established by proof." *State v. Sander*, 682 S.W.3d 85, 99 (Mo. App. W.D. 2023) (internal quotation omitted).

Proof of authenticity may come in several forms and may be demonstrated by direct or circumstantial evidence. *See Hein*, 553 S.W.3d at 897 (citing *State v. Hosier*, 454 S.W.3d 883, 899 (Mo. banc 2015)). The proponent of a text message may present "an admission by the author [that] he or she wrote the message or by discovering something distinctive about the text message that can identify the author." *Id.* (citing *Harris*, 358 S.W.3d at 175). For example, the person who received the text messages may testify that they "regularly receive[] text messages from the author from [that] number[.]" *Harris*, 358 S.W.3d at 175. Proper authentication of the content of text messages requires the proponent to establish not merely ownership of the phone but authorship of the text messages, which is a requirement beyond "mere confirmation that the number belonged to a particular person." *State v. Francis*, 455 S.W.3d 56, 71 (Mo. App. E.D.

8

2014) (internal citation omitted). Courts recognize that authenticating text messages "should not be an unduly burdensome requirement[.]" *State v. Abdi*, 611 S.W.3d 536, 540 (Mo. App. E.D. 2020) (citing *Harris*, 358 S.W.3d at 175). "Some proof" must be offered that the messages were authored by the person who allegedly sent them. *Harris*, 358 S.W.3d at 175.

The trial court has discretion as the initial gatekeeper of admissibility "[s]o long as sufficient evidence justifies the trial court's admission of evidence as authentic[.]" *Samsinak*, 688 S.W.3d at 266 (quoting *Miller v. State*, 636 S.W.3d 197, 205 (Mo. App. S.D. 2021) (quoting *Abdi*, 611 S.W.3d at 540)). It remains for the jury to assess "any weaknesses as to authenticity of the evidence" in determining the weight and credibility of the authentication of the text messages. *Id.*; *see also Harris*, 358 S.W.3d at 175-76 ("Once the evidence is admitted, it is still the province of the jury to determine its weight.").

Having established the rules of authenticating text messages, we now apply them to Lumzy's challenged exhibits.

C.  The Trial Court Did Not Err in Admitting Outgoing Texts Sent By Lumzy to A.W.

In Point One, Lumzy challenges the State's authentication of Outgoing Texts.

On appeal, Lumzy correctly distinguished between the State's proof of phone ownership and proof that Lumzy actually authored the text messages. As noted above, the State needed to present only "some proof that the message[s] were actually authored by the person who allegedly sent them." *Harris*, 358 S.W.3d at 175. A Cellebrite report alone is not evidence of authorship of text messages. *See Sander*, 682 S.W.3d at 100 (internal citations omitted). A Cellebrite Report provides a record of the content communication of the target phone. *Sander* found that a Cellebrite report may provide sufficient proof of authentication for the admission of phone usage or location data, but is not sufficient to establish authorship of a text message by a particular

9

person.  *See id.*  In finding the Cellebrite report laid sufficient foundation for the defendant's search history on the phone's browser, *Sander* reasoned that phone usage and location data differ from text messages in that text messages "contain expressive content that may suggest a message was written by one or another person" such that that proof of authorship is required.  *Id.*  Here, therefore, we agree with Lumzy that the State needed to offer "some proof" beyond the Cellebrite report that Lumzy authored Outgoing Texts in order to authenticate them, as ownership of the phone alone is insufficient.  *See id.*  Contrary to Lumzy's argument, however, the record here did contain "some proof" of authorship beyond the Cellebrite report when the trial court admitted Outgoing Texts.

Specifically, we consider circumstantial evidence of D.P.'s earlier trial testimony in combination with the timestamps in the Cellebrite report, and ultimately Lumzy's testimony wherein he admitted authoring and sending Outgoing Texts.  In *Hein*, this Court determined that an electronic scan of a handwritten letter purportedly written by the victim to the defendant about the deterioration of their relationship was not properly authenticated.  *See Hein*, 553 S.W.3d at 896–97.  Although retrieved from the defendant's computer's stored files, the letter's mere presence on the defendant's computer did not prove that the victim authored the letter, nor was there any other circumstantial evidence as to authorship.  *See id.* at 897.  Conversely, in *Abdi*, circumstantial evidence was found to authenticate the defendant as authoring the letter at issue, as the evidence tended to show that "the writer of the Letters was someone in the same location as Abdi, with the same knowledge as Abdi, and with the same incentives as Abdi—namely, Abdi."  *Abdi*, 611 S.W.3d at 540.  Here, previous testimony was offered by D.P. that she witnessed Lumzy speaking to someone on the phone minutes after the shooting.  The shooting occurred between 11:45 A.M., and before 1:30 P.M., when Maintenance Technician saw Lumzy,

10

D.P. and the children in the parking lot. When laying foundation for Outgoing Texts, the State elicited testimony from Detective that the Cellebrite report indicated Lumzy's two text messages were sent at 12:59:58 P.M. and 1:00:13 P.M., respectively. Detective also testified from the Cellebrite report that a phone call was made from Lumzy's phone to A.W.'s phone at 1:02:41 P.M. The timestamps of the texts and calls, in conjunction with D.P.'s testimony that she had seen and heard Lumzy speaking on the phone after the shooting, reveal that the record contained "some proof" that Lumzy authored Outgoing Texts. *See Harris,* 358 S.W.3d at 175. As the State argues, the Supreme Court of Missouri emphasizes that "order of proof rests in the judicial discretion of the trial court, and 'if from the whole record it appears that the evidence is competent and relevant and otherwise admissible, the order in which it is offered and admitted is generally immaterial.'" *State v. McBride*, 438 S.W.2d 222, 223 (Mo. 1969), *quoted in State v. Henderson*, 666 S.W.2d 882, 891 (Mo. App. S.D. 1984)). It is apparent, upon review, that D.P.'s statement confirming witnessing Lumzy's phone call supported the trial court's determination that there was sufficient circumstantial evidence that Lumzy authored Outgoing Texts that were sent mere minutes beforehand. *See Abdi*, 611 S.W.3d at 540.

Finally, although not necessary to perfect the trial court's authentication analysis at the time of admission, the authenticity of Outgoing Texts was unquestionably established by Lumzy himself.[4] At trial, Lumzy testified that he called A.W. and spoke with her after shooting Victim. Moreover, in cross-examination, Lumzy also testified that he sent both Outgoing Texts to A.W.,

---

[4] Lumzy argues that, pursuant to *State v. Hollowell*, 643 S.W.3d 329, 336 (Mo. banc 2022), his subsequent testimony did not waive his objections to Text Messages for lack of foundation. *Hollowell* is readily distinguishable as it opines on the issue of waiver and thus preservation of the issue. Rather, this Court is concerned with whether there was harmless error. Lumzy's argument is unavailing because it is distinguishable on both the facts and legal questions before this Court. *See id.*

thereby resolving any dispute as to his authorship. Thus, the trial court did not abuse its discretion in admitting Outgoing Texts. *See id.*

        D.      <u>The Trial Court Did Not Err in Admitting Incoming Text Sent by D.P. to Lumzy</u>

In Point Two, Lumzy challenges the State's authentication of Incoming Text.

At trial, D.P. testified that "I texted [Lumzy]. I blocked his number and texted him and told him I would rather deal with child support and washing my hands of him." The State then elicited further testimony as to what the statements in this text meant to her, and D.P. stated that the message meant that she was ending her "dealings" with Lumzy. Detective had also testified that Incoming Text was sent to a phone number owned by Lumzy. It is on this testimony, including proof of ownership, which the State offered as authentication of Incoming Text for admission into evidence. Once again, crucial to the trial court's analysis for the admission of this evidence, Lumzy admitted in his own trial testimony to receiving the "child support" message from D.P. Consequently, the trial court did not abuse its discretion in admitting Incoming Text. *See Samsinak*, 688 S.W.3d at 266 (citing *Brandolese*, 601 S.W.3d at 533).

We, again, consider circumstantial evidence, as the State needed to present "some proof that the message[s] were actually authored by the person who allegedly sent them." *Harris*, 358 S.W.3d at 175. Specifically, this can come in the form of "an admission by the author he or she wrote the message." *Hein*, 553 S.W.3d at 897 (citing *Harris*, 358 S.W.3d at 175). Such is the case at hand. D.P. testified she sent Lumzy a text message detailing the content of the text that was later admitted into evidence by the trial court as Incoming Text. Although D.P.'s testimony did not mirror verbatim the content of Incoming Text, there is sufficient evidence through D.P.'s testimony to conclude that she was the author of such message and the accuracy of the content of message. As seen in *Abdi*, this court held that the circumstantial evidence was enough to find some proof of authorship based upon the content of the letter matching that of defendant's

knowledge and incentives. *See Abdi*, 611 S.W.3d at 540. Here, there is clear testimony from D.P. that she authored this text message—evidence that is beyond what was found to be supportive of authorship in *Abdi*. Lumzy argued that the testimony by D.P. was insufficient in that it merely amounted to evidence of a text on a similar subject, sent at some point in time. To the contrary, D.P. actually testified that this was a text message she sent to him on the day of the shooting, and exactly what she intended to communicate to Lumzy through said message. The Missouri Supreme Court's emphasis that the order of proof is immaterial as long as the whole record reflects that "the evidence is competent and relevant and otherwise admissible" is also applicable in this instance. *See Henderson*, 666 S.W.3d at 891 (quoting *McBride*, 438 S.W.3d at 223). Here, the trial court had sufficient basis in the record to admit Incoming Text at the time it was offered based on D.P.'s prior testimony at trial. Further, although again not required to establish authentication, this was unmistakably established by Lumzy's testimony. He confirmed he had received Incoming Text from D.P. and that he had previously received messages from D.P. of this content, thereby resolving any dispute as to her authorship.

Ultimately, courts recognize that authenticating text messages "should not be an unduly burdensome requirement." *Abdi*, 611 S.W.3d at 540 (citing *Harris*, 358 S.W.3d at 175). At the time of admission, D.P's previous testimony that she witnessed Lumzy talking on his phone after the shooting and the Cellebrite record reflecting this timeline constituted sufficient circumstantial evidence of authentication for Outgoing Texts. Additionally, D.P.'s prior testimony that she had sent a text message mirroring the content of Incoming Text constituted sufficient authentication for the trial court to admit Incoming Text. Moreover, Lumzy's testimony admitting receipt and regular communication with D.P regarding child support and testimony admitting authorship of Outgoing Texts established authorship of Text Messages beyond a shadow of a doubt. Finding

13

no error, by the trial court, we will not address Lumzy's allegations of prejudice. *See Piers*, 688 S.W.3d at 73 (internal citation omitted). We deny Points One and Two.

**II. Point Three—The Trial Court Did Not Abuse its Discretion in Admitting Kidnapping Evidence**

A. Standard of Review

As in Points One and Two, we review challenged evidentiary rulings for an abuse of discretion. *See id.*

B. Use of Uncharged Bad Acts Generally

This Court recognizes that, generally, "evidence of uncharged prior bad acts is inadmissible to show the propensity of the defendant to commit the charged offense." *State v. Greer*, 679 S.W.3d 531, 535 (Mo. App. E.D. 2023) (citing *State v. Madrigal*, 652 S.W.3d 758, 772 (Mo. App. E.D. 2022)). This inadmissibility is in place so that the "accused may not be found guilty or punished for a crime other than the one on trial." *Id.* (quoting *Madrigal*, 652 S.W.3d at 772). This prohibition "prevent[s] the jury from 'us[ing] the evidence of the uncharged crime to infer the defendant has a general criminal disposition, a bad character, or propensity or proclivity to commit the type of crime charged,' and in turn, 'basing a finding of guilt on the uncharged crime.'" *Madrigal*, 652 S.W.3d at 772 (quoting *State v. Jackson*, 636 S.W.3d 908, 920-21 (Mo. App. W.D. 2021)). However, an exception to the general prohibition exists if this evidence tends to establish any of the following: "1) motive; 2) identity of the person charged; 3) intent; 4) absence of mistake or accident; 5) a common scheme or plan; or 6) a complete and coherent picture of the circumstances and events surrounding the charged crime." *State v. Coleman*, 580 S.W.3d 11, 13 (Mo. App. E.D. 2019) (internal quotation omitted); *see also Madrigal*, 652 S.W.3d at 772 (quoting *State v. Winfrey*, 337 S.W.3d 1, 11 (Mo. banc 2011)).

14

All "evidence must be both ***logically relevant***, in that it has some legitimate tendency to establish the guilt of the accused for the charges for which he is on trial, and also ***legally relevant***, in that its probative value outweighs its prejudicial effect." *Id.* (emphases added). To balance probative value and prejudicial effect, "the trial court must carefully consider that the inevitable tendency of such evidence is to raise a legally spurious presumption of guilt in the minds of the jurors." *Greer*, 679 S.W.3d at 535 (quoting *Jackson*, 636 S.W.3d at 921). This balancing test "lies within the sound discretion of the trial court." *Madrigal*, 652 S.W.3d at 772 (quoting *State v. Miller*, 372 S.W.3d 455, 474 (Mo. banc 2012)).

Having established the rules of introducing evidence of uncharged bad acts, we now apply them to Lumzy's challenged Kidnapping Evidence.

C.     The Trial Court Did Not Err in Admitting Kidnapping Evidence

Lumzy argues the Kidnapping Evidence should have been redacted or excluded because it was inflammatory and more prejudicial than probative given that the kidnapping charges were dismissed. In response, the State contends that the evidence was admissible under the complete-picture exception to prove the charged offenses. In particular, the evidence provides a complete picture that Lumzy stole D.P.'s car, that Lumzy's self-defense claim fails, and that the Kidnapping Evidence was not unfairly prejudicial. *See Coleman*, 580 S.W.3d at 13-14. We agree with the State.

First, we find the Kidnapping Evidence was logically relevant to proving that Lumzy stole D.P.'s car, a crime with which he was charged, and to disproving his self-defense claim. *See id.*; *see also State v. Pool*, 674 S.W.3d 173, 182 (Mo. App. E.D. 2023) (noting that the State bears the burden of disproving self-defense once it is injected by the defendant). Specifically, the Surveillance Footage depicted Lumzy driving away with D.P.'s car, and Still Image depicted Lumzy's and D.P.'s demeanors—Lumzy smiling after the shooting, and D.P. showing clear

15

signs of distress—which was admissible to establish elements of stealing, particularly that Lumzy took D.P.'s car without her permission. *See* § 570.030[5] (providing that stealing requires proof that the defendant appropriated the property of another either without their consent or by means of deceit or coercion). Likewise, in 911 Call, Maintenance Technician reported his observations of the dispute between Lumzy and D.P. in the parking lot, which was directly relevant to proving the taking of the car was against D.P.'s will, as well as disproving Lumzy's claims of self-defense. *See Coleman*, 580 S.W.3d at 13-14. Additionally, the State suggests that Lumzy's bizarre smile after shooting Victim, compared to the distress of D.P. and the children, supports the State's argument that Lumzy did not act in self-defense. The Kidnapping Evidence also detailed Lumzy's flight from the shooting, furthering the State's argument that this was not an act of self-defense. *See Pool*, 674 S.W.3d at 179 (quoting *Hosier*, 454 S.W.3d at 895) (noting consciousness of guilt can be demonstrated through evidence of flight). Therefore, because the Kidnapping Evidence contained evidence relevant to proving the elements of a charged offense and disproving the elements of self-defense, the evidence was logically relevant. *See Miller*, 372 S.W.3d at 473-74.

We further find Kidnapping Evidence was admissible to provide a "complete and coherent picture" of the events that transpired just after the shooting. *Id.* (quoting *State v. Primm*, 347 S.W.3d 66, 70). "[I]t is . . . well settled that evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged may be admissible 'to present a complete and coherent picture of the events that transpired." *Madrigal*, 652 S.W.3d at 774 (internal quotation omitted); *see also Coleman*, 580 S.W.3d at 13 (internal citation omitted). Here, just after the conduct forming the basis of the burglary and murder

---

[5] All statutory references are to RSMo (Cum. Supp. 2021), unless otherwise noted.

charges, the challenged evidence shows Lumzy forcibly took D.P. and the children to the parking lot, caused them distress, then ultimately fled the scene, stealing D.P.'s vehicle and cell phone in the process. *See Coleman*, 580 S.W.3d at 13-14. The Kidnapping Evidence was thus probative of *all* charged acts, including murder in the first degree and burglary in the first degree, because it set out the context of the offenses that painted a complete picture for the jury of the sequence of events. *See Madrigal*, 652 S.W.3d at 774-75; *Coleman*, 580 S.W.3d at 13-14.

Second, we find the Kidnapping Evidence was legally relevant. Lumzy contends that the trial court should have excluded Kidnapping Evidence as it was more prejudicial than probative and inflammatory, making it more likely that the jury convicted him for uncharged bad acts rather than for the charged conduct. Thus, Lumzy argues that Kidnapping Evidence was not legally relevant. "Evidence is legally relevant if its probative value outweighs its costs—'unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness.'" *State v. Morgan*, 674 S.W.3d 497, 505 (Mo. App. W.D. 2023) (quoting *Jackson*, 636 S.W.3d at 921). We "afford[] great deference to the trial court's assessment of whether evidence is legally relevant." *Id.* (internal quotation omitted). The trial court permitted the State to use Kidnapping Evidence to establish Lumzy's intent in shooting Victim and the circumstances surrounding the shooting and stealing of D.P.'s car—not the mere "propensity" of Lumzy to commit the charged crimes. At trial, the State highlighted the distress expressed by D.P. and children in the Still Image. While the evidence may be prejudicial, we find that it is not unfairly prejudicial. *See id.* In *Pool*, we held that evidence of the defendant's flight and subsequent high-speed chase by an officer was more probative than prejudicial and thus legally relevant to proving the mens rea of assault and disproving the defendant's self-defense claim.

*Pool*, 674 S.W.3d at 180.  Here, as in *Pool*, the Kidnapping Evidence was both logically and legally relevant to proving stealing and rebutting Lumzy's self-defense claim.  *See id.*

Because the Kidnapping Evidence was relevant and admissible under a well-recognized exception to the general exclusionary rule for propensity evidence, the trial court did not abuse its discretion in admitting Kidnapping Evidence.  *See Coleman*, 580 S.W.3d at 13-14.  Finding no error by the trial court, we will not address Lumzy's allegations of prejudice.  Thus, we affirm the trial court's evidentiary ruling.  *See id.*  Point Three is denied.

### III.    Point Four— The Trial Court Did Not Err, Plainly or Otherwise in Submitting Instruction No. 19 to the Jury

#### A.    Standard of Review

To preserve a claim that the trial court erred in refusing to give a requested jury instruction, Lumzy must submit the proposed instruction in writing.  *See* Rule 28.02(b)[6] (stating "counsel shall submit to the court instructions and verdict forms that the party requests to be given[;] [i]nstructions and verdict forms that a party requests shall be submitted in writing"); *see also State v. O'Keefe*, 681 S.W.3d 615, 626 (Mo. App. E.D. 2023) (quoting Rule 28.02(b)).  Although Lumzy properly objected to this claim of error at trial and submitted his own instruction, Lumzy omitted this issue from his motion for a new trial.  Thus, the claim was not preserved.  *See O'Keefe*, 681 S.W.3d at 626 (internal citations omitted).  Lumzy acknowledged this omission and requested plain error review, we find the trial court committed no error plain or otherwise.

Plain error review is conducted in a two-step process.  *State v. Henderson*, 551 S.W.3d 593, 600 (Mo. App. W.D. 2018) (citing *State v. Hunt*, 451 S.W.3d 251, 260 (Mo. banc 2014); *State v. Myles*, 479 S.W.3d 649, 655 (Mo. App. E.D. 2015)).  First, we determine whether the

---

[6] All Rule references are to Mo. R. Crim. P. (2025).

18

claim of error affects substantial rights. *Id.* (citing *Hunt*, 451 S.W.3d at 260). "Substantial rights are involved if, facially, there are significant grounds for believing that the error is of the type from which manifest injustice or miscarriage of justice could result if left uncorrected." *Id.* (quoting *Hunt*, 451 S.W.3d at 260). Specifically, plain errors are those that are "evident, obvious, and clear." *Id.* (quoting *Hunt*, 451 S.W.3d at 260). If evidence of facial plain error is found, we must then determine the second step—"whether the error actually did result in manifest injustice or a miscarriage of justice." *Id.* (citing *Hunt*, 451 S.W.3d at 260).

"Instructional error seldom constitutes plain error." *Myles*, 479 S.W.3d at 655 (internal citation omitted). "To show that the trial court plainly erred in submitting a jury instruction, a defendant must go beyond a demonstration of mere prejudice." *Id.* (internal citation omitted). Instructional error rises to the level of plain error if "the trial court has so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict and caused manifest injustice or miscarriage of justice." *Id.* at 655‗56 (internal citation omitted). "Manifest injustice or miscarriage of justice will result only if it is apparent that the jury's verdict was tainted by the instructional error." *Id.* at 656 (internal quotation omitted). "The defendant bears the burden of showing that plain error has occurred which resulted in manifest injustice or a miscarriage of justice." *Id.* (internal citation omitted).

B.      The Trial Court Did Not Err In Submitting Instruction No. 19 To The Jury

In Point Four, Lumzy argues that the State's verdict director for burglary in the first degree improperly lowered the State's burden of proof, which resulted in a manifest injustice or miscarriage of justice that requires reversal. We disagree.

"Rule 28.02(c) mandates the exclusive use of a MAI -CR instruction whenever there is one applicable under the law and Notes on Use." *Henderson*, 551 S.W.3d at 600 (citing *State v. Clay*, 533 S.W.3d 710, 715-16 (Mo. banc 2017)). The law is clear that "[w]henever there is an

MAI-CR instruction or verdict form applicable under the law and Notes On Use, the MAI-CR instruction or verdict form shall be given or used to the exclusion of any other instruction or verdict form." Rule 28.02(c). Compliant use of MAI-CR is the default rule, and adhering to it cannot constitute error. *See Henderson*, 551 S.W.3d at 600; *State v. Brown*, 669 S.W.3d 733, 736 (Mo. App. S.D. 2023) (mandating the exclusive use of any applicable MAI-CR instruction); *State v. Bellamy*, 680 S.W.3d 596, 606 (Mo. App. W.D. 2023).

Here, Lumzy concedes that Instruction No. 19, the verdict director for first-degree burglary, does not diverge from the mandated MAI-CR 4th 423.52. Indeed, Lumzy does not claim error in the use of that pattern instruction, and his proffered verdict director was identical to the State's in that regard. *See Brown*, 669 S.W.3d at 736-37 (noting that no error lies where the instruction does not diverge from the MAI-CR). Rather, Lumzy argues that where MAI-CR 4th 423.52 requires inserting the definition of the underlying felony supporting the first-degree burglary charge, Instruction No. 19 used the wrong definition of assault.

The Notes on Use require defining the underlying offense in the instruction. *See* MAI-CR 4th 423.52 Notes on Use 2(a). As for the source of the definition, the Notes on Use specifically refer the drafter to MAI-CR 4th 433.00, which lists definitions for use in instructing juries under MAI-CR. *See id.* If an offense is not defined there, "an appropriate definition of the offense shall be drafted and submitted to the court for approval." MAI-CR 4th 433.00 Notes on Use 2D. The MAI-CR 4th 433.00 provides a definition for "assault" to be used in all MAI-CR instructions as follows: "[*As used in Chapter 455.010 to 455.085*] means purposely or knowingly placing or attempting to place another in fear of physical harm. [§ 455.010(1)(a), RSMo 2016]."

Instruction No. 19 is directly patterned after the MAI-CR 4th 433.00 as directed by stating: "[a] person commits the crime of assault when he or she purposefully or knowingly

20

places or attempts to place another in fear of physical harm." However, Lumzy correctly points out that this definition of "assault" in the MAI-CR derived from § 455.010(1)(a) is taken from the domestic adult abuse section of the Missouri *civil* code rather than from the *criminal* code. Lumzy argues the trial court erred in refusing his proffered instruction, which he maintains appropriately modified the MAI-CR by using the *criminal code* definition of assault in the fourth degree from § 565.056, RSMo (2016).[7] Lumzy's rejected instruction read: "[a] person commits the crime of assault when he or she purposefully or knowingly places or attempts to place another in *immediate* fear of physical harm." (Emphasis added). Lumzy emphasizes that the civil code definition of assault, required by MAI-CR 4th 423.52 and 433.00, is problematic for two reasons. First, Lumzy asserts that the definition of assault from § 455.010(1)(a) is inappropriate for defining the "underlying offense" of burglary because it is not "technically a crime as defined under Missouri law." Second, Lumzy argues the civil definition omits the word "immediate." Thus, even though the State's verdict director followed the mandates of MAI-CR 4th 423.52 and 433.00, he reasons it was insufficient in the context of his case because omitting the word "immediate" found in the criminal definition of assault lowered the State's burden of proof as to assault and, thus, burglary.

Despite the curious discrepancy here of a criminal jury instruction referencing a definition contained in the civil code, which no Missouri court has commented on, we find Lumzy has not successfully rebutted the presumption that the MAI is correct and must be used. *See Henderson*, 551 S.W.3d at 600. Missouri law is clear that "Rule 28.02(c) mandates the

---

[7] Lumzy's proffered instruction uses the structure of § 455.010, the civil statute, but inserts the single word "immediate" from § 565.056.1(3), the criminal statute in the section regarding apprehension. This definition reads: "[t]he person purposefully places another person in apprehension of immediate physical injury." As such, use of the language and structure of the criminal statute in its entirety is not even Lumzy's request. Moreover, every other criminal definition of assault lacks the term "immediate." § 565.056.1(3), RSMo 2016.

exclusive use of a MAI-CR instruction whenever there is one applicable under the law and Notes on Use." *Bellamy*, 680 S.W.3d at 606 (internal citation omitted). Additionally, "where there is an applicable MAI-CR instruction, that instruction must be given to the exclusion of any other instruction." *Id.* (internal quotation omitted). Undoubtedly, MAI-CR 4th 423.52 is the mandated first-degree burglary verdict director and thus should be followed as instructed and not modified. Rule 28.02(c). Modifications are only permitted when it is "simple, brief, impartial, and free from argument" and "where possible, shall follow the format of MAI-CR instructions, including the skeleton forms therein." Rule 28.02(d). As MAI-CR 4th 423.52 was used at trial as directed, no error can be found. *See Brown*, 669 S.W.3d at 736–37.

Although not necessary to affirm Lumzy's conviction on burglary in the first degree, given that the challenged verdict director conformed with the MAI-CR, we choose to address Lumzy's concern that using a definition of assault from the civil code rather than the criminal code resulted in a lower burden of proof. We have determined that there was no prejudice to the outcome of his trial in the omission of the term "immediate" from Instruction No. 19.

Lumzy correctly contends that due process of law requires the State to prove each element of the charged offense beyond a reasonable doubt, or else there is insufficient evidence for conviction. *See State v. Watts*, 688 S.W.3d 632, 634 (Mo. App. W.D. 2024). Even if, assuming *arguendo* that the trial court had erred by not giving Lumzy's modified instruction, we still find any such alleged error harmless given the rest of the instructional language. *See Myles*, 479 S.W.3d at 658 ("instructional error was not outcome determinative because the jury would have found Jones guilty even if the jury had been properly instructed[]").

Specifically, Instruction No. 19 additionally instructed that the jury should convict on the charge of burglary in the first degree if the evidence supported a finding that, while Lumzy was

22

in the apartment, he caused "immediate physical injury" to Victim.[8] It follows that, even if the definition of assault lacked the term "immediate," the paragraph required the jury to find Lumzy caused "immediate physical injury" to Victim in order to convict him of burglary in the first degree with the intent to commit the underlying felony of assault. Thus, the State's burden of proof was not lowered as Lumzy alleges.

Here, even if the trial court had given Lumzy's proffered instruction, the outcome of his trial would not have been any different. *See id.* at 659. When reviewing the sufficiency of evidence to support a criminal conviction, a court is limited to "determining whether there is sufficient evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *State v. Minor*, 648 S.W.3d 721, 736 (Mo. banc 2022) (internal quotations omitted); *see also State v. Tate*, No. SC 100676, 2025 WL 977739, at *4 (Mo. Apr. 1, 2025) (quoting *Musacchio v. United States*, 577 U.S. 237, 244 (2016) (explaining "the legal question in a sufficiency challenge is 'whether the evidence was strong enough to reach the jury at all'")).

Based on the facts adduced at trial, it is not apparent to this Court that the alleged failure to include the term "immediate" affected the jury's verdict such that the trial court erred in refusing Lumzy's proposed instruction. Therefore, the omission does not constitute manifest injustice and there is no plain error. *See Brown*, 669 S.W.3d at 735-37. Point Four is denied.

<u>Conclusion</u>

The judgment of the trial court is affirmed.

Rebeca Navarro-McKelvey, J.

_____

Rebeca Navarro-McKelvey, J.

Lisa P. Page, P.J. and Virginia W. Lay, J., concur.

---

[8] "Third, that while the defendant was in the inhabitable structure he caused immediate physical injury to [decedent], and that [decedent] was not a participant in the offense, then you will find the defendant guilty under Count III of burglary in the first degree."

23